# 24-135

————————————————

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————————————

TERA GROUP, INC.; TERA ADVANCED TECHNOLOGIES, LLC;
and TERAEXCHANGE, LLC.

*Plaintiffs-Appellants,*

*v.*

CITIGROUP, INC.; CITIBANK N.A.; CITIGROUP GLOBAL MARKETS INC.; CITIGROUP GLOBAL MARKETS LIMITED; BARCLAYS PLC; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS, S.A.; BNP PARIBAS SECURITIES CORP.; CREDIT SUISSE AG; CREDIT SUISSE GROUP AG; CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE INTERNATIONAL; JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES LLC; J.P. MORGAN SECURITIES PLC; and UBS SECURITIES LLC.

*Defendants-Appellees.*

————————————————————————————————

On Appeal from the United States District Court
for the Southern District of New York
Case No. 17-cv-04302 (RJS)
The Honorable Richard J. Sullivan

————————————————————————————————

## BRIEF OF TERA GROUP APPELLANTS

————————————————

Jason H. Kim
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
300 S. Grand Ave., Suite 2700
Los Angeles, California 90071
Telephone: (323) 997-1057
jkim@schneiderwallace.com

*Counsel for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Tera Group, Inc., Tera Advanced Technologies, LLC, and TeraExchange, LLC state the following:

Tera Group, Inc. is the parent company of TeraExchange, LLC and Tera Advanced Technologies, LLC. No publicly held corporation owns 10% or more of its stock. Both TeraExchange, LLC and Tera Advanced Technologies, LLC are wholly owned subsidiaries of Tera Group, Inc. No publicly held corporations own 10% or more of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..............................................ii

TABLE OF CONTENTS...............................................................................iii

TABLE OF AUTHORITIES ....................................................................... v

INTRODUCTION ....................................................................................... 1

JURISDICTION........................................................................................... 3

STATEMENT OF THE ISSUE.................................................................... 3

STATEMENT OF THE CASE .................................................................... 4

    a.   Procedural History ....................................................... 4

    b.   Legal Background........................................................ 6

    c.   Factual Background ..................................................... 8

SUMMARY OF ARGUMENT ................................................................... 26

STANDARD OF REVIEW ........................................................................ 29

ARGUMENT .............................................................................................. 29

I.   Tera States Plausible Sherman Act Claims Against Each
    Defendant.......................................................................... 29

    a.   The district court's improper jettisoning of Tera's "collective"
       allegations rendered the rest of its analysis erroneous..........30

    b.   Tera gives each Defendant fair notice. ....................................34

    c.   The district court ignored five out of eight forms of parallel
       conduct. ..................................................................................36

    d.   The district court ignored at least two—and as many as five—
       plus factors..............................................................................45

II. TERA ALSO STATES PLAUSIBLE CLAIMS UNDER THE DONNELLY ACT ........................................................... 53

CONCLUSION .................................................................... 54

CERTIFICATE OF COMPLIANCE ....................................... 55

CERTIFICATE OF SERVICE ................................................ 56

# TABLE OF AUTHORITIES

## Cases

*AD/SAT, a Div. of Skylight Inc. v. Associated Press,*
  181 F.3d 216 (2d Cir. 1999)................................................................34

*Anderson News, L.L.C. v. Am. Media, Inc.,*
  899 F.3d 87 (2d Cir. 2018)................................................................46

*Anderson News, LLC v. American Media, Inc.,*
  680 F.3d 162 (2d Cir. 2012)..................................................... passim

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)...................................................................... passim

*Broadcast Music, Inc. v. CBS,*
  441 U.S. 1 (1979).............................................................................30

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
  996 F.2d 537 (2d Cir. 1993)..........................................................6, 29

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
  370 U.S. 690 (1962).........................................................................34

*Eagle Lion Films v. Loew's Inc.,*
  219 F.2d 196 (2d Cir. 1955).............................................................34

*Gelboim v. Bank of Am. Corp.,*
  823 F.3d 759 (2d Cir. 2016)..................................................... passim

*In re Aluminum Warehousing Antitrust Litig.,*
  95 F. Supp. 3d 419 (S.D.N.Y. 2015)..............................................54

*In re Credit Default Swaps Antitrust Litig.,*
  2014 U.S. Dist. LEXIS 123784 (S.D.N.Y. Sept. 4, 2014) .........24, 45, 52

*In re Interest Rate Swaps Antitrust Litig.,*
  261 F. Supp. 3d 430 (S.D.N.Y. 2017)........................................31, 32, 47

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
359 U.S. 207 (1959) ........................................................... 6, 29

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013) ................................... 7, 45, 51, 53

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
861 F. Supp. 2d 344 (S.D.N.Y. 2012) .................................... 53

*People v. Rattenni*,
81 N.Y.2d 166 (1993) ............................................................ 53

*Starr v. Sony BMG Music Ent.*,
592 F.3d 314 (2d Cir. 2010) ............................................. 6, 30

*Tera Grp., Inc. v. Citigroup, Inc.*,
2018 U.S. Dist. LEXIS 169625 (S.D.N.Y. Sept. 28, 2018) .................... 5

*Tera Grp., Inc. v. Citigroup, Inc.*,
2019 U.S. Dist. LEXIS 128107 (S.D.N.Y. July 30, 2019) ...................... 4

*Tera Grp., Inc. v. Citigroup, Inc.*,
2023 U.S. Dist. LEXIS 143786 (S.D.N.Y. Aug. 14, 2023) .................... 5

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) ............................................. 6, 33

*Williams v. Citigroup Inc.*,
659 F.3d 208 (2d Cir. 2011) .................................................. 53

## Statutes

15 U.S.C. §§ 15(a) and 26 ........................................................ 3

28 U.S.C. §§ 1331, 1337(a), and 1367 ...................................... 3

## Other Authorities

Karen Brettell, *Banks' pressure stalls opening of U.S. derivatives trading platform*, REUTERS (Aug. 27, 2014) .................................... 12, 22

Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL ST. J. (Feb. 16, 2015) ........................................................................... 22, 43

Matthew Leising, *A Safer Way to Trade Interest Rate Swaps*, BLOOMBERG (Feb. 27, 2014) .................................................... 12

Morgan Stanley & Oliver Wyman, THE FUTURE OF CAPITAL MARKETS INFRASTRUCTURE (2011) ............................................................ 13

## Rules

Fed. R. App. P. 4(a)(7)(A)(ii) ........................................................... 3

Fed. R. App. P. 26.1(a) ................................................................... ii

Fed. R. Civ. P. 12(b)(6) ................................................................ 46

Fed. R. Civ. P. 58(c)(2)(B) ............................................................ 3

## INTRODUCTION

Tera's original complaint alleged that twelve large banks conspired to block Tera's credit default swap trading platform from successfully entering the market. After every bank moved to dismiss, the district court found that Tera plausibly stated federal and state antitrust claims against six of the defendants, but it dismissed the remainder of Tera's claims. Opposing counsel then pressured Tera to remove several allegations from its complaint, and Tera filed an Amended Complaint with modified allegations. Defendants again moved to dismiss. And this time, the district court dismissed Tera's Amended Complaint in its entirety.

This result only makes sense if Tera's original complaint was a house of cards, with a few key (modified) allegations holding the whole thing up. But this is not what the district court described in its *first* order. Rather, the district court described a foundation built on background evidence; a structure comprised of *eight* different forms of parallel conduct; a solid roof built from *three* 'plus' factors, or pieces of circumstantial evidence that make a conspiracy more likely; and insulation that linked each remaining defendant to the conspiracy. True,

the district court, at times, found the original versions of Tera's now modified allegations persuasive. But those original allegations were only dispositive for one defendant, Barclays. As for the other five, the first order correctly analyzed Tera's complaint "holistically," emphasizing many key facts that remain fully intact in the Amended Complaint.

The dissonance between the first order and the second order is jarring. In the second order, the district court backtracked, contradicting much of its prior reasoning. It improperly jettisoned allegations involving the defendants as a group, which infiltrated and poisoned its analyses of parallel conduct and plus factors; it discounted or omitted allegations it previously and correctly gave weight to; it made inferences in favor of the defendants that it previously and correctly made in favor of Tera; and it otherwise failed to analyze Tera's Amended Complaint as a whole. Simply put, the first order applied the law (almost) correctly, and the second order cannot be squared with the first. This Court should reverse the district court's decision to dismiss Tera's Amended Complaint.

## JURISDICTION

The district court had jurisdiction under the Clayton Act, 15 U.S.C. §§ 15(a) and 26; and 28 U.S.C. §§ 1331, 1337(a), and 1367. On August 14, 2023, the district court dismissed Tera's Amended Complaint, but no separate judgment was subsequently entered. On January 10, 2024, Appellants filed a notice of appeal, which was timely pursuant to Fed. R. Civ. P. 58(c)(2)(B) and Fed. R. App. P. 4(a)(7)(A)(ii). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

The district court previously held that Tera stated plausible antitrust claims against six defendants. But after Tera modified some allegations, the district court dismissed the case entirely. Was the district court correct in finding that Tera's claims were no longer plausible?

## STATEMENT OF THE CASE

### a.   Procedural History

In June 2017, Tera filed its original complaint, asserting four claims against twelve banks for conspiring to boycott Tera's CDS trading platform.[1] Every bank moved to dismiss.

In July 2019, Judge Richard J. Sullivan found that Tera stated plausible federal and state antitrust claims against six defendants.[2] However, the district court dismissed Tera's antitrust claims against the other defendants and dismissed Tera's unjust enrichment and tortious

---

[1] *Tera Grp., Inc. v. Citigroup, Inc.*, Complaint, D. Ct. Dkt. 1, A-52 (filed June 8, 2017) [referenced in citations as "OC"]. The Appendix is referenced by "A" followed by the bold page number in the lower right-hand corner of the page. Appellants Tera Group, Inc., Tera Advanced Technologies, LLC, and TeraExchange, LLC are referred to simply as "Tera."

[2] *Tera Grp., Inc. v. Citigroup, Inc.*, 2019 U.S. Dist. LEXIS 128107, at *5, A-114 (S.D.N.Y. July 30, 2019) [the "first order" or "*Tera Grp. I*"]. The six remaining defendants ("Defendants") are: Citigroup, Inc.; Citibank N.A.; Citigroup Global Markets Inc.; Citigroup Global Markets Limited ("Citi"); Barclays PLC; Barclays Bank PLC; Barclays Capital Inc. ("Barclays"); BNP Paribas, S.A.; BNP Paribas Securities Corp. ("BNP"); Credit Suisse AG; Credit Suisse Group AG; Credit Suisse Securities (USA) LLC; Credit Suisse International ("Credit Suisse"); JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; J.P. Morgan Securities LLC; J.P. Morgan Securities PLC ("JP Morgan"); and UBS Securities LLC ("UBS").

interference with business relation claims as to all defendants.[3]

Then, after discovery in a separate proceeding "called into question" several of the allegations in Tera's original complaint, "Defendants served a Rule 11 notice on Tera and demanded that it withdraw those allegations from its pleading."[4] Tera filed its Amended Complaint in January 2020.[5] Out of 92 paragraphs of factual allegations, Tera substantively revised eight paragraphs and removed four.[6]

Defendants again jointly moved to dismiss. And in August 2023, the district court granted Defendants' motion and dismissed Tera's Amended Complaint.[7]

---

[3] *Id.* In late 2018, the district court dismissed UBS AG for lack of personal jurisdiction and dismissed RBS for lack of personal jurisdiction and failure to state a claim. *See Tera Grp., Inc. v. Citigroup, Inc.*, 2018 U.S. Dist. LEXIS 169625, at *4 (S.D.N.Y. Sept. 28, 2018). Tera does not challenge any of these dismissals.

[4] *Tera Grp., Inc. v. Citigroup, Inc.*, 2023 U.S. Dist. LEXIS 143786, at *12, A-200 (S.D.N.Y. Aug. 14, 2023) [the "second order" or "*Tera Grp. II*"].

[5] *Tera Grp., Inc. v. Citigroup, Inc.*, Amended Complaint, D. Ct. Dkt. 167, A-142 (filed Jan. 30, 2020). Herein, the Amended Complaint is referenced simply by "¶".

[6] Tera substantively modified OC ¶¶ 91, 93–97, 99, and 126, and removed OC ¶¶ 92, 98, 100–01. In total, approximately 13% of Tera's allegations were altered. *See* A-83–86, 95, 167–70, 177–78.

[7] *Tera Grp. II*, at A-194.

### b.    Legal Background

"Section 1 of the Sherman Act bans restraints on trade effected by a contract, combination, or conspiracy." *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (quotations omitted). To state a Section 1 claim, a plaintiff must allege facts showing: (1) "a combination or some form of concerted action between at least two legally distinct economic entities," and (2) "that the agreement constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).

"Where, as here, the alleged conduct—a group boycott—is unlawful *per se*, the only question is 'whether the challenged conduct stems from independent decision or from an agreement, tacit or express.'" *Tera Grp. II*, at A-202 (citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959)); quoting *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010)).

An agreement can be established in one of two ways. "First, a plaintiff may, of course, assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws. Such

6

evidence would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level." *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). But because "this type of 'smoking gun' can be hard to come by, especially at the pleading stage," a plaintiff may instead "present circumstantial facts supporting the inference that a conspiracy existed." *Id.*

Such circumstantial facts take the form of (1) parallel conduct and (2) plus factors. *Id.*; *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016). Given that parallel conduct is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy," a plaintiff must place its parallel-conduct allegations "in a context that raises a suggestion of a preceding agreement" by pleading plus factors. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553–54, 557 (2007). Plus factors can include "a common motive to conspire," evidence showing that "parallel acts were against the apparent individual economic self-interest of the alleged conspirators," and "evidence of a high level of interfirm communications." *Gelboim*, 823 F.3d at 781 (citations omitted).

7

Thus, to survive a motion to dismiss, a complaint must plead "enough factual matter (taken as true) to suggest that an agreement was made," and may do so through allegations of parallel conduct and plus factors. *Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 556–57). But since "plausibility is a standard lower than probability," a plaintiff "need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action." *Gelboim*, 823 F.3d at 781 (quoting *Anderson News*, 680 F.3d at 184).

### c.    Factual Background

Credit default swaps ("CDS")[8] are one of the most widely traded financial instruments in the world, with trillions of dollars in contracts outstanding each year. A-145 (¶ 2). Each CDS derives its value from the risk associated with a credit event, like the chance that a company will default on a payment or have its credit rating downgraded. *Id.*

---

[8] Herein, "CDS" refers to either the singular ("swap") or the plural ("swaps").

8

1.     *Defendants control the CDS market.*

The Dealers,[9] including Defendants, are among largest players in the CDS market. A-145 (¶ 1). They collectively control approximately 95% of CDS trading. A-146 (¶ 3). Two Defendants, JP Morgan and Citi, control more than 25% all CDS dealing in the United States. *Id.*

The Dealers profit by creating and selling CDS to "buy-side" investors, like mutual funds, hedge funds, and insurance companies. A-146 (¶ 4). The Dealers collect a fee from buy-side investors for each contract they trade. *Id.* This fee is determined by the "bid-ask spread": the difference between the price at which a Dealer will "bid" to buy or "ask" to sell a certain CDS. *Id.* (¶ 6). The wider the bid-ask spread, the higher the cost to the buy-side, and the larger the profit for the Dealers. Given the high volume and large size of CDS trades, this is a lucrative business. *Id.* (¶ 4).

To maximize profits, the Dealers created and enforced a lopsided market structure where buy-side customers did not have access to the same pricing information. A-146 (¶ 5). Its centerpiece was the "Request

---

[9] The "Dealers" are the six Defendants plus the previously dismissed defendants.

9

for Quote" or "RFQ" system. *Id.* This system required buy-side customers who wanted to trade CDS to contact a Dealer directly, identify themselves (a practice known as "name give-up"), and state the terms of the desired CDS, *before* they could receive a price quote. *Id.* (¶ 6). This procedure was not just opaque, slow, and inefficient; it also stymied competition because it prevented the buy-side from receiving equivalent price information. *Id.* The Dealers took advantage of this informational asymmetry, quoting grossly inflated bid-ask spreads to buy-side investors. *Id.* Meanwhile, the Dealers traded CDS with *each other* on anonymous interdealer platforms with fair and accurate pricing information. *Id.* (¶ 5).

2. *Dodd-Frank threatened to upend the Dealers' control.*

After the 2008 financial crisis, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") overhauled the financial system. A-147, 158 (¶¶ 7, 43). Title VII was intended to reform the swaps market by "promot[ing] pre-trade price transparency."[10] "To this end, Dodd-Frank sought to end Defendants' RFQ-only model by requiring CDS and other swaps to be traded on a regulated electronic

---

[10] A-147, 58 (¶¶ 7, 44) (quoting 7 U.S.C. § 7b-3(e)).

10

exchange called a Swap Execution Facility ("SEF"), which would allow market participants to make bids and offers on CDS in the same manner that they would trade common stock."[11] As SEFs are regulated by the CFTC like other public exchanges, this reform introduced a layer of oversight into a previously unregulated market. A-158 (¶ 44). A public exchange model, where customers could choose which swaps they wanted to trade based on competitive information and *prior* to entering a transaction, was the opposite of Defendants' opaque and self-serving RFQ system. A-147, 158 (¶¶ 7, 44).

Dodd-Frank also required most CDS trades to be cleared through a centralized clearinghouse. A-160 (¶ 50). Because the clearinghouse acts as an intermediary between the two swap participants and guarantees performance on each contract, this requirement removed the risk of a

---

[11] *Tera Grp. I*, at A-115 (citing ¶ 7). Pursuant to Dodd-Frank, regulation of the CDS market is divided: the Commodity Futures Trading Commission ("CFTC") regulates CDS indices, while the Securities and Exchange Commission ("SEC") regulates single-name CDS. A-159 (¶¶ 45–46). The CFTC's SEF mandate went into effect in February 2014 for CDS indices, which made up 76% of CDS transaction volume in the first half of 2014. *Id.* ¶ 46. But the SEC has yet to mandate SEF execution and central clearing for single-name CDS. A-163 (¶ 57). "Nevertheless, a significant volume of single-name CDS have been executed on SEFs and centrally cleared through clearinghouses since 2013." *Tera Grp. I*, at A-115 (citing ¶ 47).

counterparty defaulting, and thus obviated the need to know a buy-side customer's identity before trading. *Id.*[12]

While these reforms were welcomed by buy-side investors, the Dealers were less enthused. A-148 (¶ 12). As Reuters reported:

> Trading swaps on new electronic venues has been one of the most contested reforms of the . . . derivatives markets in the United States as these contracts form a large part of bank profits. A study by consultancy McKinsey in June [2014] estimated banks could lose up to $4.5 billion in revenues annually because of electronic trading."[13]

Defendant JP Morgan admitted that the new SEF rules would "cost it $1 billion to $2 billion in revenue a year."[14] Morgan Stanley acknowledged that all-to-all "trading platforms [were] well placed to gain market share from the dealers," and projected that SEF platforms would

---

[12] In addition, Dodd-Frank fostered "post-trade" price transparency by requiring that participants report their transactions to a centralized recordkeeping entity known as a Swap Data Repository, and requiring swap values to be reported continuously for the duration of the trade. A-160 (¶¶ 48–49).

[13] A-148 (¶ 12) (quoting Karen Brettell, *Banks' pressure stalls opening of U.S. derivatives trading platform*, REUTERS (Aug. 27, 2014) (emphasis added)).

[14] A-148 (¶ 12 n.6) (quoting Matthew Leising, *A Safer Way to Trade Interest Rate Swaps*, BLOOMBERG (Feb. 27, 2014)).

generate $5-6 billion dollars in execution revenues annually by 2013.[15]

### 3.    *The meteoric rise of TeraExchange.*

Seeking to harness these changing winds, a group of industry veterans founded TeraExchange: a transparent, independent, and competitive platform for CDS trading. A-147, 161 (¶¶ 8, 51). Tera spent several years developing its SEF platform and raised millions of dollars from outside investors. *Id.* (¶¶ 8, 52). To achieve all-to-all trading among market participants, Tera's platform used a central limit order book ("CLOB"), the same transparent mechanism used in securities markets to anonymously match customer orders. *Id.* TeraExchange was the first platform to offer anonymous, all-to-all, CLOB-based trading to the CDS market. *Id.*

The platform's all-to-all functionality and anonymity lowered transaction costs and improved pricing. A-161 (¶ 53). It also connected with clearinghouses, swap data repositories (where transaction prices are reported and stored after each trade), and other intermediaries. *Id.* (¶ 54).

---

[15] A-149 (¶ 12 n.7) (citing Morgan Stanley & Oliver Wyman, THE FUTURE OF CAPITAL MARKETS INFRASTRUCTURE 4, 20 (2011)).

But to further attract buy-side customers, Tera tailored its platform to their exact needs. A-148 (¶ 10). For instance, it designed the platform to be both user friendly and sophisticated, replete with advanced analytics and charting, full-market depth, and executable real-time pricing. A-162 (¶ 55). TeraExchange uniquely allowed customers to track prices and trade on both types of CDSs (single-name and indices) at the same time, thus allowing for arbitrage between the two products. A-148, 163 (¶¶ 10, 57). Tera developed a proprietary pre-trade credit confirmation tool, which allowed participants to pre-screen orders and increase clearing certainty. A-162 (¶ 56). TeraExchange was also the only anonymous, all-to-all, CLOB-based platform licensed to list CDS indices. A-148, 163 (¶¶ 10, 57).

Tera's platform offered a unique value proposition. *Id.* And the market responded accordingly. A-147 (¶ 9). Fifty percent of market participants polled in an April 2014 survey conducted by IPC Systems Inc. reported that they had already connected or planned to connect to TeraExchange. A-147, 164 (¶¶ 9, 60). Only one SEF scored slightly higher. *Id.* And the *Wall Street Letter*, a respected source on trading technology, nominated TeraExchange for three of its 2013 Institutional

14

Trading Awards, including a "highly commended" designation for best derivatives trading platform. *Id.*

Tera used this momentum to line up sizeable commitments from many large financial firms. A-147, 164 (¶¶ 9, 61). This list included two of the largest CDS buy-side firms in the world, Lucidus Capital and Saba Capital, and banks such as Mitsubishi UFJ Financial Group and Mizuho Bank, Ltd. *Id.* Tera also successfully pitched its platform to at least six members of the FIA Principal Traders Group.[16] These firms committed to being CDS market makers on TeraExchange, either signing End User License Agreements or becoming in "simulation" by integrating TeraExchange with their own systems. *Id.* In addition, all the major clearinghouses—ICE, CME, and LCH.Clearnet—signed clearing service agreements with TeraExchange. A-165 (¶ 64). TeraExchange also garnered commitments from a dozen international interdealer brokers— intermediaries in CDS transactions—that needed to use an SEF like TeraExchange to comply with Dodd-Frank's "cross-border requirement"

---

[16] A-164 (¶ 62). Because these firms traded high volumes and were largely risk neutral, they could provide better pricing to the CDS market. A-165 (¶ 63).

15

when executing swap trades on behalf of their clients, including Defendants' foreign branches.[17]

Most notably, many of the Dealers, including Defendants UBS and Credit Suisse, claimed an interest in trading on TeraExchange when TeraExchange executives met with their senior-level employees. A-168–69 (¶¶ 78–80). For instance, UBS claimed that it wanted to use TeraExchange to intermediate client orders, so that clients would not need to become SEF participants themselves. A-169 (¶ 79).

By late 2013, before a single trade had been executed, investors estimated TeraExchange's value to be over $50 million. A-166 (¶ 67).

Such overwhelming receptivity to TeraExchange was unsurprising. Buy-side entities were sick of the Dealers' opaque and one-sided RFQ model. A-146, 169 (¶¶ 5–6, 81). The clearinghouses were responding to customer interest. A-165 (¶ 65). Interdealer brokers needed to comply with Dodd-Frank's new cross-border requirement and would rather do

---

[17] A-166–67 (¶¶ 68, 70–71). Pursuant to Dodd-Frank, all swap trades involving "U.S. Persons," whether domestic or international, must be executed through a CFTC-registered SEF. A-166 (¶ 68). Thus, any interdealer broker handling trades for a foreign branch or affiliate of a U.S. bank (like Defendants Citi and JP Morgan) had to execute those trades on an SEF or become an SEF themselves. *Id.* (¶ 68 n.18).

business with an independent platform than with their competitors. A-166, 175 (¶¶ 68–69, 97).

And though Defendants may have been frustrated to read that TeraExchange and other SEFs were "poised to take business from the big banks that have dominated swaps trading," they had few (legal) options.[18] Facing major regulatory reform and a fundamental market shift, they could at least earn fees by clearing trades on platforms like TeraExchange. A-168, 171 (¶¶ 78, 86). After all, a rational bank would rather earn those fees than have their competitors eat them up. *Id.*

### 4. The first successful trade on TeraExchange and Defendants' similar responses and pretextual justifications.

Two Defendants did just that. On June 13, 2014, the first anonymous, all-to-all swap trade was executed on TeraExchange. A-167 (¶ 72). The trade took place between Chimera Investment Corp. and Mitsubishi UFJ Financial Group, with BNP's internal clearing division (known as a Futures Commission Merchant, or "FCM") clearing the trade for Chimera, and JP Morgan's FCM clearing the trade for Mitsubishi. *Id.*

---

[18] A-165 (¶ 66) (quoting BLOOMBERG, *supra,* at n.14).

But the very next business day, BNP told Tera that it would not clear any more trades until it completed a "know-your-customer" review, including an audit of Tera's rulebook. A-167 (¶ 73). This was very strange, for several reasons.

To start, BNP had already investigated Tera, so even its own employees "seemed surprised at the need to perform an additional investigation." A-167 (¶ 73). What prompted the need for further investigation, given that the trade was successful? *Id.* (¶ 72). And why wait to investigate further until *after* clearing the trade? *Id.* (¶ 73).

Moreover, Tera's rulebook—which sets out protocols for how trades are initiated, routed, and executed—had already been audited by the CFTC. A-163 (¶ 59). In fact, the CFTC had completed its review of Tera's rulebook *nine months earlier* when it granted TeraExchange a temporary SEF certification. *Id.* So, BNP had plenty of time to review the rulebook before the first trade if it legitimately needed to. A-163, 167 (¶¶ 59, 73).

In addition to putting its own involvement on hold, Stephanie Leung, Vice President of OTC Client Clearing at BNP, told Chimera to "advise [its] trading [desk] to hold off on executing any more trades" while BNP resolved "operational issues." A-168 (¶ 73). The precise nature of

18

such "operational issues" is unknown. *Id.* (¶¶ 73–74). And BNP did not have any persuasive answers to these questions. *Id.* (¶ 73).

On the same day that BNP ceased dealing with Tera, UBS "confirmed in an internal email that it would not cooperate with TeraExchange." A-168 (¶ 75). This stood in stark contrast to UBS's previous discussions with Tera. *Id.* Previously, UBS had claimed that it wanted to use TeraExchange as an intermediary, so that its clients would not need to become SEF members themselves. A-169 (¶ 79). After months of negotiations, UBS requested to revise Tera's core documents, including its rulebook and End User License Agreement. *Id.* (¶ 80). In April 2014, two months before the successful trade, UBS finally approved Tera's revisions and Tera provided UBS with the documents for execution. *Id.* But UBS never executed the End User License Agreement. *Id.* TeraExchange had a similar experience with Credit Suisse. *Id.*

JP Morgan—also a party to the first trade—followed BNP's lead in strikingly similar fashion. A-168 (¶ 74). Like BNP, JP Morgan told Tera that it was putting its dealings on ice, because it needed to perform a "[know-your-customer] review and/or an audit of Tera's rulebook." *Id.* Like BNP, JP Morgan cited amorphous "technical issues." *Id.* And JP

19

Morgan prohibited its brokers from using TeraExchange to execute trades. *Id.*

Citi, too, "indicated it would not be trading or clearing on TeraExchange." A-168 (¶ 76). And after June 16, 2014—the day BNP put its trading on hold—no Defendant ever again cleared a trade on TeraExchange. *Id.* (¶ 77).

5. *Defendants' collective boycott and six other parallel actions.*

There was never any legitimate need to reinvestigate Tera, or re-review its rulebook, which had already been reviewed by the CFTC. A-163, 167–69 (¶¶ 59, 73–80). Nor were there any serious "operational" or "technical" issues. A-167–68 (¶¶ 73–74). These were pretexts. A-168 (¶ 78).

Unwilling to lose control over the CDS market, the Dealers conspired to boycott TeraExchange. A-149 (¶¶ 13–15). Because a single bank could not prevent TeraExchange from stealing market share, they were forced to work together. A-149, 171–72 (¶¶ 13, 85–87). Their goal was to starve TeraExchange of the liquidity it needed to operate. A-175 (¶ 96). And they succeeded: their boycott was "ultimately fatal to TeraExchange's CDS business." A-167 (¶ 73).

20

The Dealers, including Defendants, effectuated their boycott in six, parallel and complementary ways:

- *Parallel refusal to trade.* Every Dealer refused to direct any CDS transactions to TeraExchange. A-149, 168–69, 175 (¶¶ 14, 78–81, 96).

- *Parallel withholding of clearing services by the Dealers' FCMs.* The Dealers leveraged their control over the clearing business, together with Dodd-Frank's centralized clearing requirement, to paralyze any prospective transactions on TeraExchange. A-149, 165, 170–75 (¶ 14, 65, 82–96). Specifically, they used their internal clearing divisions to block buy-side customers from trading on TeraExchange, refusing to perform pre-trade credit checks or clear transactions. A-170–71 (¶¶ 82–85). These were prerequisites to trading. *Id.* Although Dodd-Frank's centralized clearing requirement was supposed to make the derivatives market more competitive, in practice it gave the Dealers complete control over which SEFs buy-side customers could trade on. A-170 (¶ 83). They used this lynchpin to shut out TeraExchange. A-149 (¶ 14).

- *Parallel steering (carrots and sticks).* Simultaneously, the Dealers forced buy-side customers away from Tera's platform by quoting them exorbitant clearing fees, while offering to execute the same trades for far less (or for free) on platforms that they controlled or preferred, all of which followed the one-sided, RFQ-only policy. A-149, 170, 174 (¶¶ 15, 82, 93). For instance, when ANZ Bank, one of the largest banks in the world, asked Citi to clear its trades on TeraExchange in April 2014, Chris Perkins, the head of clearing at Citi, informed ANZ that Citi would clear and settle ANZ's trades *for free* if they transacted with them directly via an RFQ protocol on Bloomberg or the Dealer Defendant-owned Tradeweb, but would charge them excessively high clearing fees to trade on TeraExchange. A-174 (¶ 93).

21

- *Parallel threats to the buy-side.* The Dealers pressured buy-side entities and interdealer SEFs by threatening to pull liquidity from platforms that allowed anonymous trading. A-149, 175, 183–85 (¶¶ 14–15, 95, 119–26). For instance, one interdealer SEF "received heated phone calls from executives at Credit Suisse Group AG and J.P. Morgan Chase" over the introduction of trade anonymity for the buy side.[19] Meanwhile, buy-side customers that tried to trade anonymously were put in the "penalty box," as the CEO of one interdealer broker put it, which means that they would be effectively cut off from the ability to trade derivatives. A-184 (¶ 123). The Dealers also used their heft to threaten buy-side customers with the withdrawal of "key banking services" to "make it impossible to trade other derivative products." *Id.*

- *Parallel excuses and threats to interdealer brokers.* Although Tera had signed up many international interdealer brokers, the Dealers also threatened to boycott *them* if they participated in anonymous all-to-all trading. A-185 (¶¶ 125–26). For example, an SEF expert at research firm Aite Group reported that Defendants told interdealer brokers that "if you [utilize a competitor SEF] I'll pull my business and I'll tell everyone else that I'm pulling my business and I'll tell them why."[20] The interdealer brokers needed the Dealers' consent before executing trades on TeraExchange. A-183 (¶ 121). But the Dealers, including Citi and JP Morgan, delayed and ultimately refused to give their consent, citing illegitimate reasons like the fact that they had not signed onto Tera's rulebook. A-175–78 (¶¶ 97–103).

---

[19] A-183–84 (¶ 121) (citing Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL ST. J. (Feb. 16, 2015)).

[20] A-185 (¶ 126) (citing Karen Brettell, *Banks' Pressure Stalls Opening of U.S. Derivatives Trading Platform*, REUTERS (Aug. 27, 2014)).

- *Parallel adherence to name-give-up (surveillance and threats).* The Dealers all insisted on "name give-up," or post-trade name disclosure, to police whether market participants were doing as they were told. A-178–183 (¶¶ 104–118). This was completely unnecessary after Dodd-Frank, and prejudiced buy-side customers who were forced to reveal their trading positions and strategies. *Id.* One way that the Dealers effectuated this plan was by requiring interdealer brokers to use MarkitWIRE, a cumbersome and unnecessary service that offered counterparties the option of canceling transactions after revealing the identity of the counterparty. A-180–82 (¶¶ 111–15). And they boycotted any trading platforms that refused, starving them of liquidity. A-180. (¶ 111).

Factoring in the two forms of parallel conduct discussed above—Defendants' parallel responses to the first trade and their similar pretextual justifications—brings the tally up to eight.

### 6. Six pieces of circumstantial evidence move the needle even further toward conspiracy.

Tera also pleads three plus factors and three other strongly suggestive pieces of circumstantial evidence:

- *Common motive.* Each Defendant sought to keep their opaque and self-serving RFQ system in place. A-146, 148, 178, 182 (¶¶ 4, 12, 106–07, 117, 119). Thus, each Defendant had a strong financial interest in shutting out TeraExchange, the only independent SEF offering all-to-all CDS trading, so they could maintain control over the CDS market and maintain their profits. A-146, 148–49 (¶¶ 5–6, 12–14).

- *Each Defendant's actions cut against their individual self-interest.* Absent collusion, Defendants' internal clearing

23

divisions would have followed client demand and cleared CDS trades on TeraExchange (or at least presented legitimate reasons for refusing to), while earning substantial fees. A-169, 171 (¶¶ 81, 86). Defendants' FCMs should have been agnostic about which SEF their clients used, seeking to maximize the number of trades they cleared for their clients. A-171 (¶ 86).

- *High level of interfirm communications.* The Dealers were able to coordinate their activities because their clearing operations communicate regularly with each other. A-173 (¶ 90). The Dealers, including Defendants, hold overlapping roles in institutions critical to the CDS market, including being joint owners and clearing members of ICE Clear, and being clearing members at CME and LCH.Clearnet. A-172 (¶¶ 87–88). Defendants' similar and nonsensical preoccupations with Tera's rulebook and End User License Agreement provide further support. *See* A-167–176 (¶¶ 73 (BNP), 74, 100 (JP Morgan), 80 (UBS and Credit Suisse), 98 (Citi)).

- *Defendants' history of potential antitrust violations in the CDS market.* The Dealers have already been accused of blocking anonymous, all-to-all trading from entering the CDS market at least once before.[21] In 2011, the U.S. Department of Justice and the European Commission both launched investigations into the Dealers' conduct in the CDS market. A-149 (¶ 16). In 2015, the Dealers paid $1.86 billion to settle a class action brought by investors accusing them of fixing prices on CDS transactions and blocking the launch of an anonymous CDS platform. *Id.* Defendants are also currently under investigation by the CFTC for similar misconduct in the interest rate swaps market. *Id.* And Citi recently revealed

---

[21] *See In re Credit Default Swaps Antitrust Litig.*, 2014 U.S. Dist. LEXIS 123784, at *14–15 (S.D.N.Y. Sept. 4, 2014) (explaining that plaintiffs alleged that the Dealers conspired to shut down CDMX—an electronic, anonymous CLOB platform for CDS—as it was poised to enter the market in 2008).

that it is a target of the CFTC's "*industrywide*" probe into "the trading and clearing of interest rate swaps by investment banks." *Id.* While the Dealers' exclusionary tactics have evolved post Dodd-Frank, their goal to restrict CDS trading to the RFQ-only protocol has remained the same. *Id.*

- *CDS market dominance*. The structure of the CDS market is susceptible to collusion. The Dealers control 95 percent of all CDS trading and constitute nearly all the CDS clearing members at each of the three major CDS clearing houses. A-146, 172–73 (¶¶ 3, 87–89). High barriers to entry, like the multimillion-dollar collateral deposits required to join a clearing house, prevented others from competing. A-170 (¶ 83). This consolidation allowed Defendants to leverage Dodd-Frank's clearing requirement to boycott TeraExchange. *Id.*

- *TeraExchange's meteoric rise*. Tera's platform solved both a financial and regulatory need. A-147–48, 161–67 (¶¶ 7, 9–10, 52–71). Buy-side customers would be free from Defendants' one-sided RFQ system, A-161 (¶ 52), while interdealer brokers would be able to satisfy Dodd-Franks' cross-border requirements, A-166–67 (¶¶ 68–71). Tera's clients' inexplicable decisions to withdraw from the platform after the first successful trade is at odds with their expressed desire and financial investment. A-174–75 (¶¶ 94–96). This supports that it was Defendants' boycott—rather than natural market forces—that caused buy-side and interdealer brokers to only use platforms that favored Defendants. A-175 (¶ 95). Buy-side traders repeatedly confirmed Tera's allegations. A-181–183 (¶¶ 114, 117–18).

## SUMMARY OF ARGUMENT

In the first order, the district court held that, when "viewed holistically," Tera "pleaded sufficient parallel conduct and plus factors to state a plausible Section 1 claim" with respect to all six Defendants. *Tera Grp. I*, at A-139. Although the Amended Complaint contains modified allegations, this conclusion still holds. The clearest way to show so is by comparing the district court's wildly disparate reasoning—regarding factual allegations that either did not change at all or did not change by much—from one order to the next.

A.    First, the district court erroneously changed its treatment of Tera's allegations that discuss Defendants collectively. Although the first order found that they should be "discounted as worthy of less weight," the district court explained that "they may nevertheless be taken into account, alongside more specific allegations, in determining whether Tera has pleaded a plausible Section 1 conspiracy." *Tera Grp. I*, at A-126. This is because the court had a "duty to consider the [c]omplaint as a whole." *Id.* at A-127. But the second order took the opposite fork. While the district court repeated the dubious mantra that collective allegations "are worthy of less weight," it ultimately found that they are of "*little*

*value.*" *Tera Grp. II*, at A-203–04 (emphasis added and citations omitted). And by "little value," it meant "worthless," because when it turned to analyzing Defendants' parallel conduct and plus factors, it only considered the 17 paragraphs it considered "particularized." *See id.* By jettisoning the other 45 paragraphs—nearly three-quarters of Tera's factual allegations "about Defendants' conduct"—the district court ruined the rest of its analysis. *See id.*

B.     The first order also rigorously analyzed each Defendant's link to the conspiracy. *See Tera Grp. I*, at A-127–32. In accordance with that analysis, Tera's now-modified allegations are only dispositive for Barclays. *See id.* Again, dismissing every Defendant was only achievable by throwing most of Tera's allegations out the window and mischaracterizing what remained. *See Tera Grp. II*, at A-203–04.

C.     The two orders' analyses of Defendants' parallel conduct cannot be squared, either. In bullet points and discussion spanning over four pages, the first order detailed all *eight* different forms of parallel conduct that Tera pled. *Tera Grp. I*, at A-132–36. But the second order— with no reasoning at all—summarily recognized only *three. Tera Grp. II*, at A-204. In doing so, the district court neglected two forms of parallel

conduct that were *unaltered* from one complaint to the next. And while the three other forms are different, they did not disappear; rather, these categories include many of Tera's strongest and most detailed allegations. *See Tera Grp. I*, at A-132–34.

D.    The district administered the coup de grâce by reframing all of Tera's 'plus' factor allegations and drawing inferences in favor of Defendants. *See Tera Grp. II*, at A-205–208. Yet Tera's allegations regarding Defendants' common motive—which have not changed—still lend "strong support to the inference of a prior agreement"; Tera's allegations that each Defendant's actions ran contrary to their individual self-interest—which have not changed—still "lend further" support; and Tera still makes a "substantial showing" that there was a high level of communications between Defendants. *Tera Grp. I*, at A-136–38.

Viewed properly, Tera pleads eight forms of parallel conduct, at least three plus factors, and when combined, a robustly plausible conspiracy. "Less plausible" does not mean "implausible."

## STANDARD OF REVIEW

This Court "review[s] the grant of a motion to dismiss *de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Gelboim*, 823 F.3d at 769.

## ARGUMENT

### I. Tera States Plausible Sherman Act Claims Against Each Defendant.

Tera satisfies both elements of a Section 1 claim, alleging facts to show that Defendants entered into an agreement, and that Defendants' group boycott was illegal *per se*. *See Mohawk Valley*, 996 F.2d at 542.

Tera alleges a *per se* violation—that Defendants conspired to boycott TeraExchange. *See Klor's*, 359 U.S. at 212 ("Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category," because "such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment."); *Mohawk Valley*, 996 F.2d at 542 (explaining that *per se* treatment is reserved for a "limited class of cases, where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are 'conclusively

29

presumed illegal without further examination.'" (citing *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 8 (1979))).[22]

Thus, for Tera "to survive a motion to dismiss," the only remaining question is whether Tera has alleged "enough factual matter (taken as true) to suggest that an agreement was made." *Starr*, 592 F.3d at 321 (quoting *Twombly*, 550 U.S. at 556).[23] Tera easily has.

### a. The district court's improper jettisoning of Tera's "collective" allegations rendered the rest of its analysis erroneous.

In the first order, the district court accepted this self-evident proposition: "Given Tera's thesis that Defendants participated in a collective boycott, it is natural that the complaint expresses some factual allegations collectively." *Tera Grp. I*, at A-126 (alterations omitted) (quoting *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430,

---

[22] Because group boycotts are *per se* unlawful, Tera need not identify a relevant market or allege a harm to competition. *See Gelboim*, 823 F.3d at 775 (explaining under the *per se* rule, "an actual adverse effect on a relevant market" is not required).

[23] Defendants did not challenge Tera's standing under the Sherman Act and thus waived such an argument. Nevertheless, both elements of antitrust standing are easily satisfied. Tera alleges that it suffered an "antitrust injury" when Defendants unlawfully boycotted TeraExchange and that, as Defendants' direct victims, they are "efficient enforcers" of the antitrust laws. *Gelboim*, 823 F.3d at 772–78.

478 (S.D.N.Y. 2017)). It is not only "natural," but necessary to use collective allegations to describe actions that every Defendant took. *See id.* Indeed, the alternative is mind-numbing. Presumably a court would rather read that "[t]he Dealer[s] leveraged Dodd-Frank's centralized clearing requirement to carry out their boycott of TeraExchange," rather than read that "JP Morgan, Citi, BNP, Barclays, Credit Suisse, and UBS, plus HSBC, Deutsche Bank, Goldman Sachs, Morgan Stanley, Bank of America, RBS, and UBS AG, leveraged Dodd-Frank's centralized clearing requirement to carry out their boycott." *See* A-170 (¶ 82).

So, while the first order was critical of Tera's "collective allegations," finding that they "should be 'discounted as worthy of less weight' relative to detailed claims," it also explained that Tera's collective allegations "may nevertheless be taken into account, alongside more specific allegations, in determining whether Tera has pleaded a plausible Section 1 conspiracy." *Tera Grp. I*, at A-126 (quoting *In Re IRS*, 261 F. Supp. 3d at 478).

Although it is unclear where this "discounting" rule comes from, the district court's original tact was closer to correct, because the court had a

"duty to consider the [c]omplaint as a whole." *Tera Grp. I*, at A-127; *see also id.* at A-126 ("Notably, as Judge Engelmayer recognized in *In re IRS*, not all group allegations are improper."); *In Re IRS*, 261 F. Supp. 3d at 478 ("[M]any references in the [Amended Complaint] as to the 'Dealer Defendants' are proper.").

But the second order applied an even steeper discount—so steep, in fact, that Tera's collective allegations were deemed valueless. *See Tera Grp. II*, at A-203–04. Even though the district court repeated the dubious mantra that collective allegations hold "less weight," it settled on an even stronger proposition: that they are of "little value." *Id.* And the district court cited nothing to directly support that. *Id.* Rather, the district court somehow derived it from the general proposition that defendants deserve "fair notice." *See id.* ("Since group-pleading allegations, like those listed above, deprive defendants of 'fair notice of what the claim is and the grounds on which it rests,' *In re IRS*, 261 F. Supp. 3d at 478 (quoting *Anderson News*, 680 F.3d at 182), they are of little value."). This is a non-sequitur.

Of course, Tera must give each Defendant "fair notice" by pleading some particularized allegations "linking" them to the conspiracy. *See*

*Tera Grp. II*, at A-203–04. And it has done so. But collective allegations do not "deprive defendants of fair notice" in a group boycott case; they augment "fair notice" by describing actions that *every* Defendant took and describing ubiquitous circumstances that make a conspiracy more plausible. *See id.*

As a result of this faulty and self-contradicting reasoning, the district court identified 62 paragraphs in the Amended Complaint "that set forth factual allegations about Defendants' conduct," disposed of 45 as having "little value" because they "are primarily directed at Defendants as a group," and analyzed Tera's allegations of parallel conduct by "[t]urning to the [17] particularized allegations." *Tera Grp. II*, at A-203–04; *see id.* at A-210.

By tossing out almost three-quarters of Tera's "factual matter" regarding Defendants' conduct—which should have been "taken as true" to evaluate whether "an agreement was made"—the district court erred. *Starr*, 592 F.3d at 321 (quoting *Twombly*, 550 U.S. at 556); *see also Apple*, 791 F.3d at 319 ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." (quoting *Cont'l Ore Co. v. Union Carbide &*

33

*Carbon Corp.*, 370 U.S. 690, 699 (1962))). And because jettisoning these allegations compromised the district court's subsequent analyses of parallel conduct and plus factors, this Court should reverse.

### b. Tera gives each Defendant fair notice.

To survive a motion to dismiss, Tera must allege facts that are sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Anderson News*, 680 F.3d at 182 (quoting *Twombly*, 550 U.S. at 555). Tera easily meets this bar for five out of the six remaining defendants.

Indeed, in the first order, the district court rigorously evaluated whether Tera "set forth sufficient facts to establish that each Defendant, 'in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *TeraGrp. I*, at A-126–32 (quoting *AD/SAT, a Div. of Skylight Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999)). The result was that five defendants were dismissed and six were not.[24]

---

[24] *Tera Grp. I*, at A-132. As the first order shows, the remaining Defendants cannot escape an adequately pled conspiracy just because the other defendants have been dismissed. *See id.*; *see, e.g.*, *Eagle Lion Films v. Loew's Inc.*, 219 F.2d 196, 199 (2d Cir. 1955) ("[T]he fact that co-

In accordance with this scrupulous reasoning, no Defendant except (perhaps) Barclays hinges on Tera's hence-modified allegations. *Compare Tera Grp. I*, at A-129 (explaining that the "Trojan Horse" allegation is the "only . . . factual allegation [that] plausibly alleges any connection between Barclays and the alleged conspiracy"), *with id.* at A-130 (finding that Tera's allegations regarding Credit Suisse, which are unrevised, "sufficiently link" it to the conspiracy), *and id.* at A-130–31 (finding that Tera's allegations "provide an ample basis for linking JP Morgan" to the conspiracy), *and id.* at A-131 (noting many allegations besides the "threat" that link BNP to the conspiracy), *and id.* at A-131–32 (noting several allegations besides the modified "audit" allegation that link UBS to the conspiracy), *and id.* at A-132 (noting many allegations besides the modified "audit" allegation and concluding that Citi is sufficiently linked to the conspiracy "[f]or *all the reasons* discussed above") (emphasis added). Indeed, Tera's allegations concerning the remaining Defendants remain largely or entirely intact.[25]

---

conspirators have not been named as parties does not at all prevent or aid the showing of their complicity.").

[25] *See* A-169–184 (¶¶ 88 nn.24–25, 103 (Barclays); ¶¶ 79–80, 87, 88 nn.24–25, 121 (Credit Suisse); ¶¶ 87 n. 23, 88 nn.24–25, 90, 100–02, 121

As the first order's detailed and holistic analysis made it very difficult to change course based on some revised allegations, the only way to dismiss every Defendant in one fell swoop was to jettison three-fourths of Tera's factual matter regarding Defendants' conduct. *See Tera Grp. II*, at A-203–04. Had the second order gone through each Defendant one-by-one like the first order did, it could not have reached the same result. *Compare Tera. Grp. I*, at A-127–32 (describing nearly every factual tether to each defendant), *with Tera Grp. II*, at A-203–04 (concluding, without any explanation, that "Tera alleges parallel conduct at only the most generalized level").

Thus, for many of the same reasons, Tera sufficiently links each Defendant to the conspiracy. And even if this Court finds that Barclays' link snapped with the filing of the Amended Complaint, that is no reason to sever any other Defendant.

### c. The district court ignored five out of eight forms of parallel conduct.

In the first order, the district court held that Tera "adequately plead[ed] parallel conduct that makes the inference of a conspiracy

(JP Morgan); ¶¶ 73, 75 (BNP); ¶¶ 87 n. 23, 88 nn.24–25, 75, 79–80 (UBS); ¶¶ 87 n. 23, 88 nn.24–25, 93, 98 (Citi)).

among the six remaining Defendants plausible." *Tera Grp. I*, at A-134. In bullet points and discussion spanning four pages, the court detailed eight different forms of parallel conduct. *Id.* at A-132–36.

Crucially, the first order analyzed Defendants' parallel conduct "holistically." *Tera Grp. I*, at A-134. The district court declined Defendants' invitation to view "some of the parallel conduct"—including Defendants' parallel refusals to trade or provide clearing services—"in isolation," because "this conduct does not stand alone." *Id.* at A-134–35. It then found that Defendants' parallel responses to the first trade and "pretextual" interest in Tera's rulebook supported the inference of a boycott, and that four other forms of parallel conduct "lend *further* support to the inference that Defendants' actions transcend mere coincidence." *Id.* at A-135 (emphasis added).

In the second order, however, the district court dismembered Tera's allegations, discarding nearly three-fourths of the paragraphs concerning Defendants' parallel conduct. *See Tera Grp. II*, at A-203–04. In other words, it belatedly accepted Defendants' invitation to view Tera's allegations in isolation. *See id.* And in sharp contrast to the eight,

37

detailed bullet points in the first order, the second order summarily found that:

> Tera alleges parallel conduct at only the most generalized level—namely, that Defendants refused to trade (or allow [interdealer brokers] to trade) on TeraExchange or clear trades that customers executed on the platform.

*Id.* at A-204. This summary is devastatingly deficient.

Besides mischaracterizing the specificity of those three forms of parallel conduct, the district court threw the other five overboard.

> 1. *The district court completely omitted two forms of parallel conduct that were fundamentally unchanged from one complaint to the next.*

Starting with the low-hanging fruit, the district court's discussion about Defendants' "steer[ing]" customers away from TeraExchange and toward platforms with opaque, RFQ-only trading, completely disappeared. *Compare Tera Grp. II*, at A-204, *with Tera Grp. I*, at A-123. But these allegations remain fully intact.[26]

---

[26] *Compare* A-149, 170, 174 (¶¶ 15, 82, 93), *with* A-59, 87, 92 (OC ¶¶ 15, 105, 116); *see* A-174 (¶ 93) (alleging that Citi told ANZ that it would charge "excessively high clearing fees to trade on TeraExchange," but would "clear and settle ANZ's trades *for free* if they transacted with them directly via an RFQ protocol" on Bloomberg or Tradeweb).

Likewise, the district court's discussion of Defendants' "parallel adherence to name give-up" vanished as well. *Compare Tera Grp. II*, at A-204, *with Tera. Grp. I*, at A-134–35 (finding that these allegations "lend further support"). These paragraphs, too, remain fully intact.[27]

Cutting these forms of parallel conduct out of the second order was arbitrary, in violation of the court's "duty to consider the [c]omplaint as a whole," and in contravention of the court's "duty to draw all factual inferences in favor of Tera at the motion-to-dismiss stage." *See Tera. Grp. I*, at A-127, 135.

> 2. *The district court improperly ignored the other three forms of parallel conduct.*

Although the other three forms of parallel conduct that the district court left out of the second order are different, they remain some of Tera's strongest allegations.

First, Tera still alleges that Defendants exhibited "parallel action towards Tera in response to its first swap trade." *Tera Grp. I*, at A-133.

---

[27] *Compare* A-178–83 (¶¶ 104–118), *with* A-95–100 (OC ¶¶ 127–141); *see, e.g.*, *Tera Grp. I*, at A-134 ("One means by which Dealer Defendants enforced name give-up was by requiring [interdealer brokers] to use MarkitWIRE—a cumbersome and unnecessary service that offered counterparties a "last look" at the trade and thereby anonymity.").

In particular, Tera alleges that: (1) BNP and JP Morgan both used amorphous "operational" or "technical" issues as a pretext, including the need to perform a "know-your-customer review" or an audit of Tera's rulebook, A-167–68 (¶¶ 73–74); (2) UBS and Credit Suisse had both claimed interest in incorporating TeraExchange into their business, but after long negotiations—which again included hang-ups over Tera's rulebook, as well as over Tera's End User License Agreement—they put their dealings with Tera on hold, A-169 (¶ 80); (3) BNP and UBS both began enforcing the boycott on the same day: June 16, 2014, A-167–68 (¶¶ 73, 75); and (4) JP Morgan and Citi took the same route in short order, *id.* (¶¶ 73, 78).

Perhaps the most unusual aspect of these allegations is that four Defendants purportedly needed to "audit" or "review" Tera's rulebook, even though this document had already been rubber stamped by the CFTC. A-163, 167–69 (¶¶ 59, 73–74, 80); *see Tera Grp. I*, at A-135 (explaining that the "inference of collaboration" is "strengthened by the . . . well-pleaded allegation that the Dealer's interest in Tera's rulebook was pretextual," given that "the Tera rulebook had already been audited by the CFTC, which had provisionally approved Tera's platform"). And

40

while UBS and Credit Suisse were ostensibly worried about Tera's rulebook before the first trade, it is curious that BNP and JP Morgan only became worried *after* their FCMs cleared the first trade, which took place nine months after Tera was provisionally approved by the CFTC. A-167–68 (¶¶ 72–74).

While Tera's current rendition is arguably not as suggestive as it was previously,[28] the district court was wrong to find that "[t]his allegation . . . no longer gives rise to an inference that Defendants collectively agreed to use the audits as a pretext for locking Tera out of the CDS market." *Tera Grp. II*, at A-206. Indeed, the district court previously found that the rulebook audits were pretextual for two reasons, and the first reason still holds. *See Tera Grp. I*, at A-135 ("(1) [T]he Tera rulebook had already been audited by the CFTC," which had provisionally approved Tera's platform, and (2) despite their expressions of interest in the rulebook, no Dealer ever completed this supposedly important audit."). Thus, the district court "contravene[d]

---

[28] *See* A-84–85 (OC ¶¶ 92–97) (alleging that BNP, JP Morgan, UBS, and Citi "almost simultaneously" called Tera saying that they would not clear any trades until they conducted an audit of Tera's rulebook, and that they never completed those audits).

[its] duty to draw all factual inferences in favor of Tera." *Id.* And while the district court "previously found" the second reason "most compelling," the first order does not say so. *Compare Tera Grp. II*, at A-206, *with Tera Grp. I*, at A-135 (listing the "never completed" reason second).

This segues into the second form of parallel conduct that the district court neglected: Defendants' "common excuses and vocabulary." *Tera Grp. I*, at A-133. Even though two out of the three allegations that the first order relied on remain well-pleaded in the Amended Complaint, the second order discarded this entire category. *See id.* at A-133–34 (relying on the "need to 'audit' Tera's rulebook," and "stringing Tera along by repeatedly reviewing and revising core documents but ultimately failing to actually execute end-user license agreements"). So, while it is true that the "Trojan Horse" paragraph is different in the Amended Complaint,[29]

---

[29] *Compare* A-177–78 (¶ 103) ("The Dealer Defendants uniformly took the position that they would not allow interdealer brokers to execute trades on TeraExchange. The reason became clear when TeraExchange learned that the Dealer Defendants regarded TeraExchange's platform as a 'Trojan Horse.'"), *with* A-95 (OC ¶ 126) ("The Dealer Defendants uniformly took the position that they would not allow inter-dealer brokers to execute trades on TeraExchange. The reason became clear when TeraExchange was told in an October 2014 meeting with Barclay's Holden Sibley and Andrew Challis, both from Barclay's Fixed Income Currency & Commodities Electronic Distribution division, that they

Defendants' two other common excuses keep this category viable. *See* A-167–69 (¶¶ 73–74, 80).

Moreover, the second order only analyzed the "Trojan Horse" allegation in the context of plus factors, finding (incorrectly) that "the Amended Complaint is largely conclusory as to" Defendants' "high level of interfirm communications." *Tera Grp. II*, at A-206–07. The district never explained why it cut Defendants' "common excuses and vocabulary" out of its analysis of parallel conduct. *See id.*

Finally, the district court neglected Tera's allegations that Defendants exerted similar pressure on customers and interdealer SEFs. *See Tera Grp. I*, at A-134; A-149, 175, 183–85 (¶¶ 14–15, 95, 119–26). For instance, one interdealer SEF "received heated phone calls from executives at Credit Suisse Group AG and J.P. Morgan Chase" over the introduction of trade anonymity for the buy side.[30] Defendants also placed buy-side customers that tried to trade anonymously in the "penalty box," meaning that Defendants would withdraw liquidity and

---

regarded TeraExchange's platform as a 'Trojan Horse.' Tera heard this same language in meetings with other Dealer Defendants.").

[30] A-183–84 (¶ 121) (citing Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL ST. J. (Feb. 16, 2015)).

effectively cut off their ability to trade derivatives. A-184–85 (¶ 123). The district court relied on these allegations the first time around. *See Tera Grp. I*, at A-134–35.

Despite Tera withdrawing its allegation that BNP threatened the parties to the first trade "with a loss of access to clearing services if they continued to trade on TeraExchange," A-84 (OC ¶ 92), this category remains robust enough to survive a motion to dismiss, *see Tera Grp. I*, at A-134–35 (explaining that "the similar kinds of pressure applied by Defendants on buyside customers and interdealer SEFs by threatening to place them in the 'penalty box'" "lend further support to the inference that Defendants' actions transcend mere coincidence").

In sum, the first order's discussion of Defendants' parallel conduct did not *hinge* on a handful of allegations that were subsequently modified. *See Tera Grp. I*, at A-134–35. Rather, it correctly analyzed Tera's allegations "holistically." *Id.* The second order did not. *See Tera Grp. II*, at A-206. Because the district court failed to consider the Amended Complaint as a whole and failed to draw all factual inferences in favor of Tera, this Court should reverse.

### d. The district court ignored at least two—and as many as five—plus factors.

A plaintiff "relying on parallel conduct must allege facts that, if true, would establish at least one plus factor": "additional facts or circumstances" that "lead to an inference of conspiracy." *Baltimore*, 709 F.3d at 137 (citations and quotations omitted). Plus factors "*may* include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Id.* at 136 (emphasis added). Here, Tera alleges as many as six.

### 1. Defendants had a common motive to boycott TeraExchange.

In the first order, the district court found that Defendants' "common motive to conspire" . . . lends strong support to the inference of a prior agreement." *Tera Grp. I*, at A-136–37. Tera "amply" pleaded that Defendants had a "common motive to conspire," because, among other reasons, "no single Defendant could prevent electronic exchanges for CDS trading from emerging, but all Defendants would profit from such prevention."[31] The court rejected Defendants' argument that their alleged

---

[31] *Tera Grp. I*, at A-137 (cleaned up) (citing *In re CDS Antitrust Litig.*, 2014 U.S. Dist. LEXIS 123784, at *28).

conduct was "within each Defendant's unilateral interest," because TeraExchange "could be defeated only through cooperation among multiple Defendants," and "Tera is under no obligation to rule out the possibility of independent action at the pleading stage." *Id.*

Likewise, the second order recognized that Defendants' "common motive to conspire[] is apparent on the face of the Amended Complaint." *Tera Grp. II*, at A-205 (citing ¶¶ 6, 12). This plus factor is easily satisfied.

Yet the second order determined that this plus factor was "negated," because there was a "plausible and justifiable reason for [Defendants'] conduct that is consistent with proper business practice." *Tera Grp. II*, at A-205–06 (quoting *Anderson News, L.L.C. v. Am. Media, Inc.,* 899 F.3d 87, 112 (2d Cir. 2018)). This reasoning, based on a summary judgment decision, "misdirected" the plausibility requirement because the "question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible." *Anderson News I*, 680 F.3d at 189–90 (2012) (reviewing a motion to dismiss). In other words, "on a Rule 12(b)(6) motion it is not the

province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives." *Id.*

Indeed, the first order recognized so. *See Tera Grp. I*, at A-125 ("The Court is not at liberty, on a motion to dismiss, to discard Plaintiffs' version of events in favor of the narrative advanced by Defendants simply because the Defendants' version is 'fully consistent' with the alleged facts.").

### 2. Refusing to clear trades on TeraExchange was contrary to each Defendant's independent self-interest.

Defendants' FCMs acted against their own self-interest when they refused to clear trades on TeraExchange because they declined a steady stream of substantial fees. A-168–72 (¶¶ 78, 81, 86). Indeed, the first order found that "this factor lends further, albeit only 'marginal,' support to the conspiracy claim," reasoning that:

> Although this conduct could arguably be the result of independent decisions to forgo doing any business with Tera because of a desire not to help a potential competitor become successful, multiple actors passing up a guaranteed income stream is more suggestive of a prior agreement to drive Tera out of the market.

*Tera Grp. I*, at A-138 (citing *In re IRS*, 261 F. Supp. 3d at 477).

47

But in the second order, the district court, again, belatedly accepted Defendants' invitation to make inferences in their favor. *Tera Grp. II*, at A-205, 207–08. This time, the court reasoned that:

> [T]he fact that TeraExchange was a threat to Defendants' RFQ margins and a potential competitor to the Tradeweb SEF was obvious to all Defendants. It therefore was consistent with "competitive business strategy" for each of the Defendants to unilaterally avoid dealing with TeraExchange.

*Id.* at A-205 (quoting *Twombly*, 550 U.S. at 554).

This explanation forgets that TeraExchange "could be defeated only through cooperation among multiple Defendants." *Tera Grp. I*, at A-137. For instance, if one or two Defendants had done business with Tera, they would have soaked up *all* the clearing fees. *See* A-187 (¶ 86). Each Defendant would only have forsaken this short-term reward if they had assurances that the others would help them to achieve a sweeter one: knocking Tera out of the CDS market for good. A-168–72 (¶¶ 78, 81, 86).

Moreover, the district court's reasoning cannot be squared with Defendants' dedicating time and money toward demonstrating interest in TeraExchange. A-168 (¶¶ 77–78). It cannot account for why UBS and Credit Suisse were in negotiations with Tera for months. A-169 (¶ 80).

48

And it cannot explain why BNP's and JP Morgan's FCMs cleared trades on TeraExchange. A-167–68 (¶¶ 72, 78).

Additionally, the second order emphasized that "Tera has failed to allege that the fees Defendants would have earned from clearing TeraExchange-based trades exceeded the 'large' profits they were earning from their own trading platforms and RFQ-based trading more generally." *Tera Grp. II*, at A-207–08 (citing ¶ 6). This observation reveals a fundamental misunderstanding of Tera's allegation and the relevant economics. Defendants' fees from TeraExchange did not have to "exceed" their ordinary profits; they just had to provide some marginal benefit. *See id.*; A-168–69 (¶¶ 78, 81). Again, Defendants' demonstrated interest shows that they did. *Id.*

Since inferences must be drawn in Tera's favor, and because Tera "need not . . . rule out the possibility of independent action" at the pleading stage, this plus factor weighs in Tera's favor as well. *See Gelboim*, 823 F.3d at 781 (quoting *Anderson News*, 680 F.3d at 184).

3.  *Defendants' high degree of interfirm communications makes a boycott even more plausible.*

In the first order, the district court found that Tera's complaint "ma[de] a substantial showing" regarding Defendants' "high degree of

49

interfirm communications." *Tera Grp. I*, at A-138. Although the court cited Tera's now-omitted allegation that BNP alerted three other Defendants about the first trade, it also relied on Tera's allegations that "regular communications took place between Defendants' clearing divisions," that Defendants held "overlapping roles in institutions critical to the CDS market," and that Defendants' "common language and techniques" provided further support.[32]

Again, the second order neglected these details in concluding that Tera's Amended Complaint is "largely conclusory as to this plus factor." *Tera Grp. II*, at A-207. As discussed above, Defendants' irrational interest in Tera's rulebook supports the inference that such communications took place. And the only issue that might hinge on Tera's

---

[32] *Id.* Paragraphs 87 through 90 are substantively unchanged. S*ee, e.g.*, A-172–73 (¶¶ 87–88) (alleging that "there was no check on [Defendants'] control of the clearing business," because "the Dealers, including . . . Defendants, have owned ICE Clear, the largest clearinghouse for CDS, since its formation in December 2008"; "the Dealers also make up nearly all of the clearing members for ICE Clear, meaning that CDS customers have no choice but to attempt to clear their CDS trades through them"; "the Dealers . . . make up nearly all the clearing members for CDS at the other two major clearinghouses"; "at the CME, the Dealers constitute 11 of the 13 clearing members who clear CDS"; and "at LCH.Clearnet, the Dealers make up 10 of the 12 CDS clearing members." (footnotes omitted)).

50

diluted "Trojan Horse" allegation is whether the Amended Complaint provides BNP with fair notice. This plus factor weighs toward a conspiracy as well.

### 4. Other circumstantial evidence points toward a conspiracy.

As the first order found, Defendants' preoccupation with Tera's rulebook and their "deployment of shared techniques to punish [interdealer brokers] and buy-side customers who engaged in all-to-all trading" also "contribute to a context suggestive of prior agreement," and "give[] further credence to the conspiracy claim." *Tera Grp. I*, at A-136–38. But beyond Defendants' parallel conduct and the plus factors elucidated so far, there are still three other pieces of circumstances that "lead to an inference of conspiracy." *Baltimore*, 709 F.3d at 137.

*First,* as laid out above, the Dealers' control over the CDS market, combined with Dodd-Frank's clearing requirement, gave them an unstoppable lever to "paralyze[] prospective CDS transactions on TeraExchange."[33]

*Second*, Tera's meteoric and deserved rise suggests that it was Defendants' boycott—not natural market forces—that caused buy-side

---

[33] *Tera Grp. I*, at A-133; *see* A-146, 170, 171–73 (¶¶ 3, 83, 87–89).

customers and interdealer brokers to only use platforms that favored Defendants.[34] For instance, Tera's clients' inexplicable decisions to withdraw from the platform after the first successful trade was contrary to their expressed desire and financial investment. A-174–75 (¶¶ 94–96).

And *third*, Defendants' history of potential antitrust violations in the swaps markets generally—and the CDS market specifically—cannot be ignored. For instance, in 2015, "the Dealers paid $1.86 billion to settle a class action brought by investors accusing them of fixing prices on CDS transactions and blocking the launch" of a different, anonymous platform for CDS trading. A-149–50 (¶ 16). Although Defendants' tactics have evolved post Dodd-Frank, their goal to maintain the opaque RFQ protocol has remained the same.[35]

In conclusion, Tera has adequately pleaded at least three plus factors, and as many as six. And because these plus factors, "when combined with parallel behavior, might permit a jury to infer the existence of an [illegal] agreement," Tera has stated plausible antitrust

---

[34] *See* A-147–48, 161–67, 175 (¶¶ 7, 9–10, 52–71, 95). Buy-side traders repeatedly confirmed these allegations. A-181–83 (¶¶ 114, 117–18).

[35] *See* A-149 (¶ 16); *In re CDS*, 2014 U.S. Dist. LEXIS 123784, at *14–15.

claims. *Tera Grp. I*, at A-137 (quoting *Baltimore*, 709 F.3d at 136 n.6). Just as in *Anderson News*, the district court erred by "disregard[ing]" certain factual allegations, erred by "characterizing" other "factual allegations as conclusory," erred by "refusing to accept as true the reasonable inferences that could be drawn from those allegations," erred by "misdirect[ing]" the plausibility requirement, and erred in its "piecemeal" reading of the complaint. 680 F.3d at 189–90. This Court should likewise reverse. *See id.*

## II. TERA ALSO STATES PLAUSIBLE CLAIMS UNDER THE DONNELLY ACT

The pleading standard for a Donnelly Act claim is the same as for a Sherman Act claim. *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012); *see Williams v. Citigroup Inc.*, 659 F.3d 208, 211 n.2 (2d Cir. 2011) ("The Donnelly Act, New York's antitrust statute, was modeled on the Sherman Act and has generally been construed in accordance with federal precedents."); *People v. Rattenni*, 81 N.Y.2d 166, 171 (1993) ("The Donnelly Act was modelled on the Federal Sherman Act, . . . and thus we have observed that State antitrust law should generally be construed in light of Federal precedent[.]" (citation and footnote omitted)).

53

Because Tera has stated plausible claims under the Sherman Act, it has stated plausible claims under the Donnelly Act as well. *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 457 (S.D.N.Y. 2015) ("[B]ecause plaintiffs have established plausible claims for relief under § 1 of the Sherman Act, their analogous claims for relief under the Donnelly Act . . . are also plausible, and may go forward.").

## CONCLUSION

For the forgoing reasons, this Court should reverse the district court's decision to dismiss Tera's Amended Complaint.


Respectfully Submitted,

April 9, 2024                         /s/ *Jason H. Kim*
                                      JASON H. KIM
                                      SCHNEIDER WALLACE
                                      COTTRELL KONECKY LLP
                                      300 S. Grand Ave., Suite 2700
                                      Los Angeles, California 90071
                                      Telephone: (323) 997-1057
                                      jkim@schneiderwallace.com

## CERTIFICATE OF COMPLIANCE

I, Jason H. Kim, counsel for Appellants and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1(a)(4), that the foregoing brief is proportionately spaced in Century Schoolbook font, has a typeface of 14 points, and contains 11,114 words.

April 9, 2024

*/s/ Jason H. Kim*
JASON H. KIM

## CERTIFICATE OF SERVICE

I, Jason H. Kim, counsel for Appellants and a member of the Bar of this Court, certify that, on April 9, 2024, the attached brief of Appellants was filed through the Court's electronic filing system. I certify that all participants in the case are registered users with the electronic filing system and that service will be accomplished by that system.

*/s/ Jason H. Kim*
JASON H. KIM