# No. 24-135

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆

TERA GROUP, INC., TERA ADVANCED TECHNOLOGIES, LLC, AND TERAEXCHANGE, LLC,

*Plaintiffs-Appellants*,

—against—

CITIGROUP, INC., CITIBANK N.A., CITIGROUP GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LIMITED, BARCLAYS PLC, BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BNP PARIBAS, S.A., BNP PARIBAS SECURITIES CORP., CREDIT SUISSE AG, CREDIT SUISSE GROUP AG, CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE INTERNATIONAL, JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, J.P. MORGAN SECURITIES PLC, RBS SECURITIES INC., AND UBS SECURITIES LLC,

*Defendants-Appellees*,

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
NO. 1:17-CV-4302, HON. RICHARD J. SULLIVAN

## JOINT BRIEF OF DEFENDANTS-APPELLEES

BRAD S. KARP
PAUL, WEISS, RIFKIND, WHARTON &
 GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

KENNETH A. GALLO
ROBERTO J. GONZALEZ
PAUL, WEISS, RIFKIND, WHARTON &
 GARRISON LLP
2001 K Street NW
Washington, DC 20006-1047
(202) 223-7300

*Attorneys for Defendants Citigroup Inc.;
 Citibank, N.A.; Citigroup Global Markets Inc.;
 and Citigroup Global Markets Limited*

ROBERT D. WICK
JOHN S. PLAYFORTH
CAROL S. WEILAND
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Attorneys for Defendants JPMorgan Chase &
 Co.; JPMorgan Chase Bank, N.A.; J.P.
 Morgan Securities LLC; and J.P. Morgan
 Securities plc*

*(Counsel continued on inside cover)*

PETER G. WILSON
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
(312) 902-5200

*Attorney for Defendant UBS Securities LLC*

ARMAN ORUC
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

CHRISTINE V. SAMA
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8851

*Attorneys for Defendants BNP Paribas, S.A.
 and BNP Paribas Securities Corp.*

JAMES E. BRANDT
LAWRENCE E. BUTERMAN
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Attorneys for Defendants Barclays PLC;
 Barclays Bank PLC; and Barclays Capital
 Inc.*

DAVID G. JANUSZEWSKI
HERBERT S. WASHER
JASON M. HALL
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
(212) 701-3000

*Attorneys for Defendants Credit Suisse AG;
 Credit Suisse Group AG; Credit Suisse
 Securities (USA) LLC; and Credit Suisse
 International*

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned Defendants-Appellees make the following disclosures:

## BARCLAYS PLC, BARCLAYS BANK PLC, AND BARCLAYS CAPITAL INC.

The undersigned counsel for Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc. certifies that Barclays Capital Inc. is a direct, wholly-owned subsidiary of Barclays Group US Inc., Barclays US Holdings Limited, and certifies that Barclays Group US Inc. is a direct, wholly-owned subsidiary of Barclays US LLC. Barclays US LLC is a direct, wholly-owned subsidiary of Barclays US Holdings Limited. Barclays US Holdings Limited is a direct, wholly-owned subsidiary of Barclays Bank PLC. Barclays Bank PLC is a direct, wholly-owned subsidiary of Barclays PLC. Barclays PLC is publicly traded on the London Stock Exchange. Barclays PLC has no parent company, and no shareholder owns more than 10% of Barclays PLC's shares.

## BNP PARIBAS, S.A., BNP PARIBAS SECURITIES CORP.

The undersigned counsel for BNP Paribas (identified in the amended complaint as BNP Paribas, S.A.) and BNP Paribas Securities Corp. certifies that BNP Paribas is a French banking corporation. BNP Paribas has no parent company and no publicly-held corporation owns 10% or more of its shares. BNP Paribas Securities Corp. is a wholly-owned indirect subsidiary of BNP Paribas.

### CITIGROUP INC., CITIBANK, N.A., CITIGROUP GLOBAL MARKETS INC., AND CITIGROUP GLOBAL MARKETS LIMITED

The undersigned counsel for Citigroup Inc., Citibank, N.A., Citigroup Global Markets Inc., and Citigroup Global Markets Limited certifies that Citigroup Inc. ("Citigroup") is a publicly traded company. Citigroup has no parent corporations, and, to the best knowledge of Citigroup, no publicly held corporation owns 10% or more of Citigroup's stock. Defendant Citibank, N.A. is a wholly owned subsidiary of Citicorp LLC which, in turn, is a wholly owned subsidiary of Citigroup. Defendant Citigroup Global Markets Inc. is a wholly owned subsidiary of Citigroup Financial Products Inc. which, in turn, is a wholly owned subsidiary of Citigroup Global Markets Holdings Inc. which, in turn, is a wholly owned subsidiary of Citigroup. Defendant Citigroup Global Markets Limited is a wholly owned subsidiary of Citigroup Global Markets Holdings Bahamas Limited which, in turn, is indirectly a wholly owned subsidiary of Citigroup Financial Products Inc. which, in turn, is a wholly owned subsidiary of Citigroup Global Markets Holdings Inc. which, in turn, is a wholly owned subsidiary of Citigroup.

### CREDIT SUISSE AG, CREDIT SUISSE GROUP AG, CREDIT SUISSE SECURITIES (USA) LLC, AND CREDIT SUISSE INTERNATIONAL

The undersigned counsel for Credit Suisse AG, Credit Suisse Group AG, Credit Suisse Securities (USA) LLC, and Credit Suisse International certifies that Credit Suisse Securities (USA) LLC is a subsidiary of Credit Suisse (USA), Inc. and

Credit Suisse Group Finance (U.S.) LLC.  Credit Suisse Group Finance (U.S.) LLC is a wholly owned subsidiary of Credit Suisse (USA), Inc.  Credit Suisse (USA), Inc. was formerly an indirect wholly owned subsidiary of Credit Suisse Group AG.  On June 12, 2023, Credit Suisse Group AG merged with and into UBS Group AG, with UBS Group AG being the absorbing company that continues to operate, and Credit Suisse Group AG being the absorbed company that ceased to exist.  Until June 12, 2023, Credit Suisse AG was a wholly owned subsidiary of Credit Suisse Group AG. Until June 12, 2023, Credit Suisse International was a wholly owned indirect subsidiary of Credit Suisse Group AG.  On June 12, 2023, Credit Suisse Group AG merged with and into UBS Group AG, with UBS Group AG being the absorbing company that continues to operate and Credit Suisse Group AG being the absorbed company that ceased to exist.  UBS Group AG has no parent company, and no publicly held corporation owns 10 percent or more of its stock.

### JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, AND J.P. MORGAN SECURITIES PLC

The undersigned counsel for JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities, LLC, and J.P. Morgan Securities plc certifies that JPMorgan Chase & Co. is a publicly held corporation.  JPMorgan Chase & Co. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.  However, The Vanguard Group, Inc., an investment adviser which is not a publicly held corporation, has reported that registered investment companies,

other pooled investment vehicles, and institutional accounts that it or its subsidiaries sponsor, manage, or advise have aggregate ownership under certain regulations of 10% or more of the stock of JPMorgan Chase & Co. Defendant JPMorgan Chase Bank, N.A. is a wholly-owned subsidiary of JPMorgan Chase & Co., which is a publicly held corporation. Defendants J.P Morgan Securities LLC and J.P. Morgan Securities plc are indirect, wholly-owned subsidiaries of JPMorgan Chase & Co., which is a publicly held corporation.

## UBS SECURITIES LLC

The undersigned counsel for UBS Securities LLC certifies that the corporate parents of UBS Securities LLC are UBS Americas Inc. and UBS Americas Holding LLC. UBS Americas Inc. is wholly owned by UBS Americas Holding LLC, which is wholly owned by UBS AG. UBS AG is wholly owned by UBS Group AG, a publicly-traded company. No publicly held corporation owns 10% of more of UBS Group AG's stock.

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................1

ISSUES PRESENTED.....................................................................3

STATEMENT OF THE CASE........................................................3

    A.    Credit Default Swaps Trading............................................3

    B.    The TeraExchange Trading Platform ..................................7

    C.    The Interest Rate Swaps Litigation .....................................9

    D.    Tera's Original Complaint .................................................10

    E.    Tera's Amended Complaint ...............................................12

    F.    The District Court's Order .................................................13

SUMMARY OF ARGUMENT .....................................................14

ARGUMENT .................................................................................17

I.    The District Court Correctly Dismissed The Complaint For Failure To Plead A Plausible Boycott Conspiracy...........................................17

    A.    The district court correctly concluded that Tera's parallel conduct allegations raise no inference of conspiracy..........................18

        1.    The district court's analysis is fully consistent with this Court's precedents. .................................................19

        2.    Tera fails to identify any error in the district court's analysis..................................................................24

    B.    The district court correctly concluded that Tera's plus factor allegations raise no inference of conspiracy. .....................................35

    C.    The district court correctly dismissed Tera's Donnelly Act claim. ..................................................................41

II.     Tera Fails To Allege Facts Connecting Any Defendant To The
        Alleged Conspiracy. ..........................................................................42

CONCLUSION ........................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) .................................................................42

*Alaska Dep't of Revenue v. Manku*,
2021 WL 3027170 (2d Cir. 2021) .....................................................42

*Andrews v. Metro N. Commuter R.R. Co.*,
882 F.2d 705 (2d Cir. 1989) .................................................................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................17, 18, 21

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................*passim*

*Biocad JSC v. F. Hoffmann-La Roche*,
942 F.3d 88 (2d Cir. 2019) .................................................................42

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993) .................................................................39

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) .................................................................51

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
92 F.4th 381 (2d Cir. 2024) ..........................................................*passim*

*In re Commodity Exch., Inc.*,
213 F. Supp. 3d 631 (S.D.N.Y. 2016) .................................................41

*Doe v. Trump Corp.*,
6 F.4th 400 (2d Cir. 2021) .................................................................40

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) .............................................................20, 37

*In re European Gov't Bonds Antitrust Litig.*,
2020 WL 4273811 (S.D.N.Y. 2020)..................................................25

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
   391 U.S. 253 (1968)......................................................................13, 36

*Garber v. Legg Mason, Inc.*,
   347 F. App'x 665 (2d Cir. 2009) ...............................................31

*In re Interest Rate Swaps Antitrust Litig.*,
   2018 WL 2332069 (S.D.N.Y. 2018)...........................................25

*In re Interest Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017) ...............................*passim*

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   340 F. Supp. 3d 285 (S.D.N.Y. 2018) ........................................40

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ....................................................39

*Litovich v. Bank of Am. Corp.*,
   568 F. Supp. 3d 398 (S.D.N.Y. 2021) ........................................24

*MacNealy v. Dayton Osteopathic Hosp. Inc.*,
   1993 WL 1377513 (S.D. Ohio 1993) ..........................................36

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ...............................17, 18, 20, 35

*In re Mexican Gov't Bonds Antitrust Litig.*,
   412 F. Supp. 3d 380 (S.D.N.Y. 2019) ...............................25, 42

*Ndremizara v. Swiss Re Am. Holding Corp.*,
   93 F. Supp. 3d 301 (S.D.N.Y. 2015) ...........................................8

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*,
   472 U.S. 284 (1985).....................................................................37

*Starr v. Sony BMG Music Ent.*,
   592 F.3d 314 (2d Cir. 2010) ...............................14, 40, 50

*TeraExchange LLC*,
   CFTC No. 15-33, 2015 WL 5658082 (Sept. 24, 2015)..................8

*In re Zinc Antitrust Litig.,*
  155 F. Supp. 3d 337 (S.D.N.Y. 2016) .................................................25

**Statutes and Regulations**

7 U.S.C. § 2 .............................................................................................4, 5

15 U.S.C. § 78c-3 .....................................................................................4, 5

17 C.F.R. § 37.3 ...........................................................................................5

17 C.F.R. § 37.9 ........................................................................................5, 6

17 C.F.R. § 242.815 ......................................................................................6

76 Fed. Reg. 10,948 (Feb. 28, 2011) ...........................................................6

78 Fed. Reg. 33,476 (June 4, 2013) .............................................................7

**Other Authorities**

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶307
  (5th ed. 2022) .........................................................................................18

## INTRODUCTION

Plaintiff TeraExchange ("Tera") alleges that it planned to launch a trading platform for credit default swaps ("CDS") that threatened the business model of CDS dealers, including the six Defendants. Tera further alleges that Defendants "boycotted" its proposed platform to prevent the platform from launching. The district court correctly dismissed those allegations on the ground that Tera failed to plead facts sufficient to raise a plausible inference of a boycott conspiracy.

When Tera originally filed this action, its complaint included several allegations that the district court viewed as well-pled allegations of parallel boycott behavior that were not easily explained as unilateral action. *See* A135. Relying heavily on those allegations, the district court sustained Tera's original complaint against the six Defendants now before this Court. But the "strongest" and "most significant" allegations in the original complaint were later exposed as false in related litigation involving the same parties. A206, 210. Tera thus withdrew those allegations to avoid a motion for sanctions. A200. With its strongest allegations stripped away, Tera's remaining allegations consisted mainly of "conclusory allegations pleaded against Defendants as a group but little more." A210. The crux of those allegations is simply that Defendants declined to help Tera launch a startup trading platform that allegedly threatened their profits. A204-05. As the district court recognized, "that conduct—without more—is not enough to support an

inference of concerted action or a preceding agreement among Defendants."  A210. To the contrary, "[i]t was … consistent with competitive business strategy for each of the Defendants to *unilaterally* avoid dealing with TeraExchange."  A205.

Second Circuit and Supreme Court precedent fully support that conclusion. At bottom, all that Tera is attempting to plead here is that Defendants engaged in "parallel decisions to resist competition" from a purported competitive threat.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 566 (2007).  But parallel resistance to competitive threats is "routine market conduct" that is "only natural anyway."  *Id*. Such routine conduct raises no inference of conspiracy because it is "just as much in line with … rational and competitive business strategy" as with an unlawful antitrust conspiracy.  *Id.* at 554.  Indeed, as this Court recently held in a similar context, it is "unremarkable that a group of the world's largest banks, which have well-established, profitable operations in the … market, would independently forgo supporting … fledgling startups" that allegedly threatened their trading profits.  *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.* ("*Treasuries*"), 92 F.4th 381, 412-13 (2d Cir. 2024).  The district court decision therefore should be affirmed.

This Court may also affirm the district court's decision on the alternative ground that Tera has failed to plead facts sufficient to connect a single one of the six individual Defendants to the alleged conspiracy.  Tera admits it has no valid claim

against Barclays, *see* Br. 2, 27, and its remaining allegations against the other Defendants likewise fail to implicate any of them in an alleged conspiracy.

## ISSUES PRESENTED

1.      Whether the district court correctly dismissed Tera's boycott claim when Tera failed to plead either parallel conduct or plus factors that raise a plausible inference of conspiracy.

2.      Whether the dismissal order should be affirmed on the alternative ground that Tera failed to plead facts sufficient to implicate any individual Defendant in the alleged conspiracy.

## STATEMENT OF THE CASE

### A.      Credit Default Swaps Trading

A CDS is a contract that "derives its value from the risk associated with a specified 'credit event,' such as the chance that a certain company will default on a payment or have its credit rating downgraded." A145 (¶2).[1]  There are two forms of CDS: single-name CDS and index CDS. A159 (¶45). Single-name CDS are based on "a single debt instrument issued by one underlying reference entity, typically a corporation or a government entity." *Id.* Index CDS are based on "a basket of

---

[1] Unless otherwise noted, all emphasis is added, and internal citations, quotations, and alterations are omitted.

underlying single-name reference-entities" and are used to "hedge macro credit risk." *Id.*

Historically, both single-name and index CDS traded "over-the-counter" between dealers and their customers using a "Request for Quote" ("RFQ") format. A146-47 (¶¶5-6). In RFQ trading, customers "contact a Dealer Defendant directly" and "specify the terms of the CDS they want[] to purchase, before receiving a price quote from that Dealer." A146-47 (¶6). According to the amended complaint, RFQ trading is "lucrative" for CDS dealers. A146 (¶4).

In 2010, Congress enacted the Dodd-Frank Wall Street Financial Reform and Consumer Protection Act ("Dodd-Frank"), which imposed new requirements on CDS trading as part of an "extensive overhaul of the U.S. financial system." A158-59 (¶¶43-44, 46). Dodd-Frank divided regulatory responsibility for CDS between the CFTC, which regulates most index CDS, and the SEC, which regulates all single-name CDS and certain types of index CDS. A159 (¶46).

Dodd-Frank authorized the CFTC and SEC to require that certain CDS be "cleared." *See* 7 U.S.C. § 2(h); 15 U.S.C. § 78c-3(a)(1), (b). In a "cleared" CDS, a "clearinghouse becomes a counterparty to both sides of each trade, acting as an intermediary between the two swap participants and guarantying performance on that contract." A160-61 (¶50). By contrast, in a non-cleared CDS, "counterparties face[] each other directly" and "assume[] the full risk of loss if their counterparty

default[s]." *Id.* Clearing is a prerequisite to the kind of anonymous, all-to-all trading that Tera sought to offer because, in the absence of clearing, "a Dealer had to face its counterparty, so as to assess creditworthiness, manage risk, and consult any [contract] that set the background terms for trades between the parties." *In re Interest Rate Swaps Antitrust Litig.* ("*IRS I*"), 261 F. Supp. 3d 430, 465 (S.D.N.Y. 2017). Because these inquiries cannot be conducted anonymously, "anonymous all-to-all exchange trading [is] impossible" without central clearing. *Id.* The CFTC mandated central clearing of certain index CDS beginning in 2013. A160-61 (¶50). The SEC has not mandated central clearing of single-name CDS. A159-60 (¶47).

Dodd-Frank also authorized the CFTC and SEC to require that CDS subject to the clearing requirement be traded on a "swap execution facility" or "SEF." 7 U.S.C. § 2(h)(8); 15 U.S.C. § 78c-3(h); *see* A158-59 (¶44). A SEF is "a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants." *Id.* The CFTC mandated SEF-trading of a subset of CDS indices. A159 (¶46); *see* 17 C.F.R. § 37.9(a)(2). The CFTC's regulation permitted CDS trading to occur on SEFs through either an RFQ system or through order book trading. 17 C.F.R. § 37.9(a)(2). In order-book trading, offers to buy and sell CDS are entered into an electronic order book and matched into trades by algorithms. *See* 17 C.F.R. § 37.3(a)(3); A147 (¶8).

Initially, the SEC was hesitant to implement similar regulations. In 2011, it observed that "the market for many [CDS] is fairly illiquid" and not amenable to "the same regulatory structure that is currently in place for equities."[2] The SEC had not enacted clearing or SEF rules for single-name CDS at the time Tera filed its amended complaint in 2020. *See* A159 (¶47). In 2023, however, the SEC issued a rule that largely mirrored the CFTC's regulation of SEF operations, though it did not mandate clearing or SEF-trading of single-name CDS. *Compare* 17 C.F.R. § 242.815(a)(2) (CFTC regulation), *with* 17 C.F.R. § 37.9(a)(2) (SEC regulation).

Although Tera suggests that Dodd-Frank and its implementing regulations were designed to end RFQ trading of CDS, Br. 10-11, that is incorrect. Both the CFTC and SEC still permit SEFs to offer RFQ trading. By maintaining this RFQ option, the CFTC and SEC accommodated widely expressed concerns that overly restrictive trading rules would hamper effective hedging in the CDS markets.[3]

---

[2] Registration and Regulation of Security-Based Swap Execution Facilities, 76 Fed. Reg. 10,948, 10,952, 10,955 (Feb. 28, 2011) ("SEF Reg. Proposal").

[3] *See supra* n.2; Dkt. 97 at 10 n.16 (collecting citations demonstrating that out of the eleven customer comments on the CFTC's draft SEF rules that addressed RFQ trading, eight supported such trading); *see also, e.g.*, Am. Benefits Council et al. Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 6 (Mar. 8, 2011) ("[T]he Commission correctly proposed … to permit SEFs to offer both RFQ and Order Book systems … as an Order Book system is only well suited for liquid markets."); Coal. for Derivatives End-Users Comment Letter on 76 Fed. Reg. 1,214, RIN 3038-AD18, at 5, 7 (Mar. 8, 2011) (arguing that "[o]verly prescriptive SEF rules" could hamper end-users' access to efficient hedging and that end-users "should be able to determine how many swap dealers should be included in any given [RFQ]").

In the wake of Dodd-Frank, at least four SEFs began offering electronic trading platforms for CDS: Bloomberg, MarketAxess, Tradeweb, and ICE.[4] As required by law, all four of these platforms offered the option of all-to-all order book trading,[5] and at least two—Bloomberg and MarketAxess—offered the same kind of *anonymous*, all-to-all order book trading Tera planned to offer.[6]

## B.    The TeraExchange Trading Platform

Seeking to capitalize on Dodd-Frank, Tera made plans to build a fifth trading platform for CDS—a platform that would have offered both order book and RFQ trading.  A161-62 (¶¶51-52, 55).  While Tera alleges that it "spent millions of dollars and several years developing a CDS trading platform" (A147 (¶8); A161-63 (¶¶52-

---

[4] *See* Notice of Grant of Temporary Registration of Bloomberg SEF LLC as a SEF (July 30, 2013), http://www.cftc.gov/stellent/groups/public/@otherif/documents/ifdocs/bloombergseftempregltr.pdf; Notice of Grant of Temporary Registration of ICE Swap Trade, LLC as a SEF (Sept. 20, 2013), http://www.cftc.gov/stellent/groups/public/@otherif/documents/ifdocs/iceswaptradetrltr092013.pdf; Notice of Grant of Temporary Registration of MarketAxess SEF Corp. as a SEF (Sept. 13, 2013), http://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/marketaxessltr091313.pdf; Notice of Grant of Temporary Registration of TW SEF LLC as a SEF (Sept. 6, 2013), http://www.cftc.gov/stellent/groups/public/@otherif/documents/ifdocs/twseftempregltr090613.pdf.

[5] *See supra* at 5-6 & n.3; Core Principles and Other Requirements for Swap Execution Facilities, 78 Fed. Reg. 33,476, 33,484 (June 4, 2013).

[6] *See* Bloomberg SEF LLC Rulebook, 522.A(c) (June 21, 2014), www.cftc.gov/idc/groups/public/@rulesandproducts/documents/ifdocs/rul062014bloom001.pdf ("Bids and offers posted on the [order book] are anonymous and will be matched on a price/time priority basis."); MarketAxess Holdings, Inc. 2013 Form 10-K at 13, https://www.sec.gov/Archives/edgar/data/1278021/000119312514065153/d663037d10k.htm (MarketAxess offers a CDS order book "which enables market participants to trade anonymously with all other market participants").

-7-

58)), it does not allege that it ever *launched* that platform. Instead, Tera concedes that it never actually "enter[ed] the market" in CDS. A169-70 (¶81).

The only swap ever executed on a Tera trading platform was an interest rate swap or "IRS" trade—not a CDS trade—that occurred on June 13, 2014.[7] A167 (¶72). The parties to the trade were Chimera Investment Corp. and Mitsubishi UFJ Financial Group, and the trade was cleared by affiliates of BNP Paribas and JPMorgan. A167 (¶72). Tera alleges that the Defendants "began working together to shut down" its yet-to-be-launched CDS platform following this IRS trade. A149 (¶13).

Other than the lone IRS trade executed on June 13, 2014, "[n]o further trading has occurred on TeraExchange." A186 (¶127). A few months later, in September 2014, Tera shifted its focus to Bitcoin derivatives trading, and in this market as well, Tera failed to attract customers to its trading platform. In September 2015, the CFTC sanctioned Tera for manufacturing fictitious Bitcoin derivative trades. *TeraExchange LLC*, CFTC No. 15-33, 2015 WL 5658082 (Sept. 24, 2015).

---

[7] Although Tera's amended complaint misleadingly omits any reference to the fact that this "swap" was an interest rate swap, it expressly alleges in the related IRS litigation that the June 13, 2014 trade was an IRS trade. *Compare* A148 (¶11), *and* A167 (¶72), *with* SA69 (¶203), *and* SA73 (¶218). The Court may consider admissions in prior complaints. *See Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989); *Ndremizara v. Swiss Re Am. Holding Corp.*, 93 F. Supp. 3d 301, 313 n.7 (S.D.N.Y. 2015).

According to the CFTC, Tera "arranged" these unlawful trades between "the only market participants on Tera's SEF." *Id.* at 1.

### C.    The Interest Rate Swaps Litigation

In April 2016, approximately a year before filing this action, Tera sued the same group of defendants for allegedly boycotting its IRS trading platform. *See Tera Grp. v. Bank of Am. Corp.*, 16-cv-2858-JPO (S.D.N.Y. Apr. 18, 2016) (Dkt. 1). Tera's IRS lawsuit was consolidated with two related actions and assigned to Judge Engelmayer. *See* MDL Order, *In re IRS*, No. 16-md-2704-JPO (S.D.N.Y. Jun. 8, 2016) (Dkt. 5). While Tera's *IRS* complaint includes many of the same allegations it later included in its CDS complaint, its *IRS* complaint also includes a number of allegations about purported conduct in the IRS market that do not appear in its CDS complaint.

Relying heavily on allegations that either were not made in this action or were initially made and later withdrawn, Judge Engelmayer denied defendants' motion to dismiss Tera's *IRS* complaint.    Notably, Judge Engelmayer found that the defendants' alleged parallel refusals to do business with Tera were "not—at all— suggestive of a conspiracy." *IRS I*, 261 F. Supp. 3d at 475.  Instead, unilateral self-interest provided a "natural explanation" for each dealer's decision not to support a new entrant that allegedly threatened its profits. *Id*.

-9-

But Judge Engelmayer found that other allegations were not as "easily explained as unilateral action." *Id.* "Most telling" was an "audit" allegation that four defendants (i) made "identical demand[s]" to audit Tera's rulebook on the first business day after its June 13, 2014 IRS trade and (ii) refused to clear any further trades on Tera until the audit was complete. *Id.* at 475-76. This allegation was "improbable enough to support an inference of collaboration." *Id.* Judge Engelmayer also relied on Tera's allegations that multiple defendants referred to it as a "Trojan Horse" and insisted on conducting "bogus" audits of Tera's rulebook without ever completing them. *Id.* at 476.

### D. Tera's Original Complaint

Tera filed this action in June 2017, accusing affiliates of twelve banks of conspiring to boycott its inchoate CDS trading platform. A55-60 (¶¶1-17). Tera's original CDS complaint carefully reiterated several allegations that Judge Engelmayer found persuasive in the *IRS* complaint, but other allegations made in the *IRS* complaint were "mysteriously absent." *See* A127 n.9.

All twelve defendants moved to dismiss Tera's initial complaint. Dkts. 97, 102, 105. Judge Sullivan granted these motions in part and denied them in part. Judge Sullivan found Tera's complaint to be "rife with homogenous group allegations" that failed to "provid[e] any examples or otherwise specify[] a Defendant who engaged in the alleged acts." A125-26. Thus, as to six defendants—

Bank of America, Deutsche Bank, Goldman Sachs, HSBC, Morgan Stanley, and RBS—the court dismissed Tera's claims on the ground that the allegations were insufficient to tie those Defendants to the alleged boycott conspiracy. *See* A127-32.[8] Tera has not appealed the dismissal of those six Defendants (the "Dismissed Defendants").

As to the other six Defendants—Barclays, BNP, Credit Suisse, Citi, JPMorgan, and UBS—the court found that the complaint adequately alleged a boycott conspiracy. *See* A129-32. First, as to Barclays, the court sustained the complaint based on a "Trojan Horse Allegation," which claimed that Barclays and other unidentified Defendants each used the unusual term "Trojan Horse" to refer to Tera's trading platform. A129-30 (citing A95 (¶126)). Second, as to BNP, Citi, JPMorgan, and UBS, the court sustained the complaint based mainly on an "Audit Allegation," which asserted that those banks "almost simultaneously contacted Tera the day following the June 13, 2014 trade," before the trade had been made public, demanding to "audit" Tera's rulebook. *See* A130-32 (citing A84-85 (¶¶92-95)). As to BNP, the court also relied on a "Threat Allegation," which asserted that BNP

---

[8] As to a foreign-domiciled RBS entity, the district court found Tera's complaint to be "completely and utterly devoid of *any* factual allegations regarding [its] role in the purported conspiracy," Dkt. 134 at 5 (emphasis in original), and as to RBS entities generally, "although the RBS entities [were] identified on page 19 of the Complaint, there [was] no reference to any [RBS entity] in the remaining 57 pages," *id.* at 6.

threatened the parties to the June 13 trade with a loss of clearing and other services. *See* A131 (citing A84 (¶¶92-93)). Finally, as to Credit Suisse, the court relied primarily on allegations that it "participated in obstructionist conduct that was similar to [UBS]." A130.

The district court also relied heavily on the Trojan Horse, Audit, and Threat Allegations in finding that Tera had pleaded enough parallel conduct and plus factors to support a plausible conspiracy overall. A135. The court characterized the Audit Allegation in particular as "[c]hief among the allegations suggesting coordination." *Id*.

### E. Tera's Amended Complaint

While Defendants' motion to dismiss Tera's CDS complaint was pending, fact discovery in the *IRS* action disproved many of the allegations Tera made in both the *IRS* action and this action, including the Trojan Horse, Audit, and Threat Allegations. Defendants therefore notified Tera of its Rule 11 obligation to withdraw these allegations. Dkt. 170. In response, Tera agreed to narrow its complaint. Dkt. 163.

On January 30, 2020, Tera filed an amended complaint that omitted a number of false allegations, including the Trojan Horse, Audit, and Threat Allegations. A142-93. A redline comparison reflecting Tera's changes to its complaint appears in the Supplemental Appendix at SA232-95.

Defendants filed a renewed motion to dismiss, arguing that the amended complaint, stripped of the false accusations, failed to state a plausible claim against any Defendant. Dkt. 174.

**F.    The District Court's Order**

Judge Sullivan granted Defendants' renewed motion to dismiss. His opinion noted that Tera had "withdrawn its strongest allegations," including the Trojan Horse, Audit, and Threat Allegations. A206-07. The court emphasized that the Audit Allegation had been "particularly suggestive of coordination," and that the amended complaint had "dropped the part of this allegation that the Court had found most compelling." A206. Likewise, the original Trojan Horse allegation had "lent credence to Tera's claim that Defendants communicated before coordinating their response," which the revised allegation no longer suggested. A206-07. The district court thus held that Tera's remaining allegations failed to state a claim for several reasons.

*First*, the court explained that the remaining allegations did little or nothing to link any individual Defendant to the purported conspiracy. A203-04. The amended complaint was "rife" with group-pleading allegations and often failed to specify "which Defendant actually engaged in the alleged conduct." *Id*. Only seventeen of the sixty-two paragraphs relating to Defendants' purported conduct included allegations identifying a specific Defendant. *Id*. Further, Plaintiffs

repeatedly ascribed conduct to unidentified "Dealers," a term that included non-defendants and thus "deprive[d] defendants of fair notice" of the claims against them. A204 & n.7.

*Second*, even in the seventeen paragraphs in which Plaintiffs identified a particular Defendant, Judge Sullivan found that, "without the since-removed portions of the Amended Complaint," A208, Plaintiffs had alleged "parallel conduct at only the most generalized level," A204. These highly general allegations "fail[ed] to demonstrate coordination between Defendants" because they were "just as much in line with … rational and competitive business strategy unilaterally prompted by common perceptions of the market." A208-09 (quoting *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010)).

*Third*, Judge Sullivan determined that Tera's various "plus factor" allegations were pled in conclusory fashion and/or were fully consistent with unilateral action. A204-09. As a result, these allegations raised no plausible inference of conspiracy. *Id.*

This appeal followed.

## SUMMARY OF ARGUMENT

**I.** The district court correctly concluded that Tera failed to plead parallel conduct and plus factors sufficient to raise a plausible inference of a boycott conspiracy. As the district court recognized, Tera's amended complaint consists

mainly of conclusory, group-pleading allegations directed at "Defendants" or "Dealers" as an undifferentiated bloc. These allegations lack the factual specificity necessary to enable a court to determine whether the Defendants engaged in any parallel conduct that would be unusual or improbable in the absence of a boycott conspiracy. The district court correctly accorded these group-pleading allegations "little value." A203-04.

Tera's few remaining allegations plead "parallel conduct at only the most generalized level," A204, and all of the alleged parallel behavior is fully consistent with "rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554. The gravamen of these allegations is that Defendants refused to do business with a startup trading platform that never actually launched. *See* A204. The district court correctly held that those allegations raise no inference of conspiracy because "avoid[ing] dealing with TeraExchange" was "consistent with competitive business strategy for each of the Defendants." A-205. That reasoning is well supported by this Court's recent holding that "[r]ational economic self-interest provides a ready explanation for [dealers'] supposed failure to patronize or invest in enterprises that could disrupt their business model." *Treasuries*, 92 F.4th at 403.

Tera asserts that the district court "ignored" some of its parallel conduct allegations, Br. 36-37, but that is incorrect. The district court analyzed each of those

allegations and concluded that they describe conduct "by one Defendant," A204, are so vague and amorphous that they "fail to demonstrate coordination between Defendants," A206, 208-09, and/or allege conduct consistent with rational and unilateral business behavior, A205. Tera identifies no error in these conclusions.

Because Tera fails to plead any meaningful parallel conduct, this Court need not address Tera's "plus factor" allegations. Nevertheless, none of those allegations supports a plausible inference that the conduct alleged in the complaint arose from a preceding agreement to boycott Tera. Tera's assertion that the six Defendants had a "common motive to conspire" suffers from the same basic flaw as its parallel conduct allegations: "the fact that TeraExchange was a threat to Defendants' RFQ margins … was obvious to all Defendants," A205, and there is no reason to infer a conspiracy from conduct that served each Defendant's "respective, individual, legitimate business interests to maintain a profitable and reliable market structure." *Treasuries*, 92 F.4th at 390. Moreover, Tera never explains why the Defendants had a common motive to boycott a nascent all-to-all trading platform that never actually launched when they did *not* boycott the four all-to-all platforms that were actually operating in the CDS market. Tera's other plus factor allegations are equally unpersuasive.

**II.** This Court may affirm the district court's decision on the alternative ground that Tera failed to plead facts sufficient to link a single Defendant to the

alleged conspiracy. Tera concedes that it pleads no facts connecting Barclays to a boycott conspiracy. Br. 27 (acknowledging that Tera's now-modified allegations are "dispositive for Barclays"). As to the other five Defendants, the "handful of allegations that do manage to identify a specific Defendant presume a conspiracy" rather than raising a plausible inference of one. A210.

## ARGUMENT

### I. The District Court Correctly Dismissed The Complaint For Failure To Plead A Plausible Boycott Conspiracy.

"[T]he first question in any Section 1 case is whether there is an agreement to conspire." *Treasuries*, 92 F.4th at 391. "An agreement may be established in one of two ways." A202. "'First, a plaintiff may, of course, assert direct evidence that the defendant entered into an agreement,'" such as "'a recorded phone call in which two competitors agreed to fix prices at a certain level.'" *Id.* (quoting *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)). Second, if a plaintiff cannot plead direct evidence of a conspiracy, it may "instead 'present circumstantial facts supporting the *inference* that a conspiracy existed.'" *Id.* (quoting *Citigroup*, 709 F.3d at 136). Such indirect evidence ordinarily consists of parallel conduct and plus factors. *See id.*

But allegations of parallel conduct that are merely "consistent" with an inference of conspiracy are not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). "[T]he mere fact that firms are rational profit maximizers in the same market implies

-17-

that they will do a fair number of things in parallel." PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶307 (5th ed. 2022). Accordingly, no inference of conspiracy can be drawn from "parallel conduct that could just as well be independent action," *Twombly*, 550 U.S. at 557, from parallel acts "that could just as easily turn out to have been rational business behavior," *Citigroup*, 709 F.3d at 137, or from parallel behavior that is "not only compatible with, but indeed [is] more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 556 U.S. at 680. Instead, parallel conduct allegations must be "reinforced by 'plus factors' that provide a basis to infer that a conspiracy arose." *Treasuries*, 92 F.4th at 391.

Applying these principles, the district court concluded that Tera's parallel conduct allegations were too general and conclusory to raise a plausible inference that the alleged parallel behavior arose from a preceding agreement. The court further concluded that Tera's plus factor allegations did not salvage its anemic parallel conduct allegations. Tera fails to identify any error in those conclusions.

### A. The district court correctly concluded that Tera's parallel conduct allegations raise no inference of conspiracy.

The district court held that most of Tera's allegations consist of conclusory group-pleading and that the few remaining allegations are too general to raise a plausible inference of conspiracy. This reasoning is fully consistent with this Court's precedents and should be affirmed.

-18-

### 1. The district court's analysis is fully consistent with this Court's precedents.

As the district court recognized, Tera's amended complaint is "rife with group-pleading allegations." A203. Of the 62 paragraphs directed at Defendants' purported conduct, "only seventeen name a particular Defendant." A203-04. These allegations constitute "almost three-quarters" of the "'factual matter' regarding Defendants' conduct" pleaded in Tera's amended complaint. Br. 33. As a result, the amended complaint includes no substantive allegations as to Barclays and few, if any, well-pled allegations identifying what the five remaining Defendants allegedly did. Indeed, in many cases, Tera fails to specify whether its allegations apply to all of the six remaining Defendants, to only some of them, or only to banks that no longer are defendants in this case. *See* A203-04 & nn.6-7.[9] The district court held that these conclusory, group-pleading allegations were "of little value." A203-04.

This analysis is correct. This Court's precedents confirm that a "failure to identify the involvement of particular defendants in the alleged conspiracy" is a

---

[9] In its amended complaint, Tera revised several allegations that previously referred to "Dealer Defendants" to refer to "Dealers" instead. *See, e.g.*, SA272-74 (¶¶ 87-91). Tera does not include these changes in its accounting of allegations that were "substantively revised," *see* Br. 5 & n.6, even though this edit often renders its allegations irrelevant to its claims against the *Defendants*. *See, e.g.*, SA272-73 (¶¶ 88-89) (failing to cite statistics for Defendants alleged to have participated in the purported conspiracy); SA273-74 (¶ 91) (discussing Tera's meeting with a non-defendant).

"basic pleading defect." *Treasuries*, 92 F.4th at 396. Thus, although a complaint may "include reference to the defendants as a group," it must ultimately "separately identify how each particular defendant contributed to the alleged conspiracy." *Id.* at 407 n.12. This Court thus rejects claims of "conspiratorial activity" pleaded in "general terms without any specification of any particular activities by any particular defendant." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007).

Tera's poorly-pled parallel conduct allegations should therefore be discounted. Tera is attempting to plead a conspiracy by alleging "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Citigroup*, 709 F.3d at 137. To plead a conspiracy on that basis, a plaintiff must plead enough *facts* to enable a court to determine whether the alleged parallel behavior is or is not "improbable enough to support an inference of collaboration." *IRS I*, 261 F. Supp. 3d at 475-76. Tera's group-pleading allegations fall short of that standard because they "mostly consist of unspecific activities of the … Defendants, fail to sufficiently specify which (if any) … Defendants furthered the alleged conspiracy or how they did so, and are otherwise vague or ill-defined." *Treasuries*, 92 F.4th at 403. Such allegations fail to provide enough facts to enable a court to distinguish between parallel conduct that "raises a suggestion of a preceding agreement" and parallel conduct that is "just as much in line with a wide

swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554, 557; *Iqbal*, 556 U.S. at 679-80 (requiring a "well-pleaded, nonconclusory *factual* allegation of parallel behavior").

The district court therefore focused its analysis on the small subset of Tera's allegations that arguably rise above conclusory group-pleading. But even in those allegations, "Tera alleges parallel conduct at only the most generalized level." A204. The crux of those allegations is that Defendants "refused to trade … on TeraExchange or clear trades that customers executed on the platform." *Id.* But "[r]ational economic self-interest provides a ready explanation for the … Defendants' supposed failure to patronize [a trading platform] that could disrupt their business model." *Treasuries*, 92 F.4th at 403. The district court thus concluded that the alleged parallel decisions to "avoid dealing with TeraExchange" were "consistent with competitive business strategy" and "do[] not support an inference of collusion or concerted action among them." A205.

The Supreme Court's decision in *Twombly* supports this conclusion. In *Twombly*, the plaintiffs attempted to plead a boycott conspiracy by alleging that the defendants engaged in parallel acts of resistance, obstruction, and even "sabotage" designed to prevent new market entrants from competing with them. *See* 550 U.S. at 550-51, 566. Although the plaintiffs argued that this parallel resistance to the new

-21-

entrants justified an inference of conspiracy, the Supreme Court held that the allegations failed to raise an inference that the alleged behavior "was anything more than the natural, unilateral reaction" of each defendant to a perceived competitive threat. *Id*. at 566. As the Court explained, the alleged parallel resistance to the startup companies provided "no reason to infer that the [defendants] had agreed among themselves to do what was only natural anyway; *so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a §1 violation against almost any group of competing businesses would be a sure thing*." *Id*. Likewise here, it is "only natural anyway" that Defendants allegedly made parallel decisions to avoid dealing with a new market entrant that allegedly threatened their business model. *See* A205.

This Court's decision in *Treasuries* applies the same reasoning to a case almost exactly like this one. In *Treasuries*, the plaintiffs alleged that seven banks that acted as Treasuries dealers "colluded to boycott existing or new electronic trading platforms that sought to offer all-to-all trading." 92 F.4th at 402. The defendants allegedly boycotted these "startup platforms" by declining to "commit liquidity," expressing "disapproval" of the platforms, and interfering with the platforms' attempts to obtain clearing services. *Id.* at 412-15 & n.16. This Court drew no inference of conspiracy from those allegations because it is "unremarkable that a group of the world's largest banks, which have well-established, profitable

operations in the ... market, would independently forgo supporting—and decide to not nurture—a pair of fledgling startups." *Id.* at 412-13. The alleged parallel acts of resistance to these all-to-all trading platforms were "only natural anyway" because defendants were "similarly situated participants in the same market" and "their objections to all-to-all trading are ones they would naturally have in common, absent any agreement." *Id.* at 403, 406. This Court thus concluded that the plaintiffs had "not alleged enough to make their claims 'conceivable,' let alone 'nudge' them 'across the line from conceivable to plausible.'" *Id.* at 413 (quoting *Twombly*, 550 U.S. at 570).

So too here. Tera's core allegation is that Defendants engaged in parallel acts of resistance to a startup platform that allegedly posed "a threat to the Dealer Defendants' supracompetitive profits from the CDS market." A148 (¶12). The district court correctly held that this allegation raises no inference of conspiracy because "avoid[ing] dealing with TeraExchange" was "consistent with competitive business strategy for each of the Defendants." A205. *Treasuries*, *Twombly*, and a host of other decisions support that conclusion. *See, e.g.*, *Twombly*, 550 U.S. at 568 (drawing no inference of conspiracy where defendants "doubtless liked the world the way it was" and presumably "were sitting tight, expecting their neighbors to do the same thing"); *Treasuries*, 92 F.4th at 413 ("Defendants could have easily concluded that trading on this unproven startup was not in their individual business

interests."); *Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 422-23 (S.D.N.Y. 2021) ("Defendants' lack of individual motivation to support [a startup platform] can be explained both by the fact that their existing business model was profitable and it was in their individual self-interests to maintain that model and by the fact that most start-up platforms quickly failed."); *IRS I*, 261 F. Supp. 3d at 475 ("Each Dealer's decision to avoid the startup platforms, like the decision by each phone company in *Twombly* not to compete in new markets, is, in and of itself unremarkable.  Considered alone, it is not—at all—suggestive of conspiracy.").

### 2.    Tera fails to identify any error in the district court's analysis.

Tera contends that the district court (a) improperly discounted Tera's group-pleading allegations, (b) failed to conduct a Defendant-by-Defendant analysis of its remaining allegations, and (c) ignored some of its parallel conduct allegations.  Tera also argues that the district court's order dismissing the amended complaint is inconsistent with its earlier order sustaining in part the original complaint.  None of these arguments has merit.

**a. <u>Group-pleading</u>**.  Tera complains that while the district court's first order gave "less weight" to group-pleading allegations, the court's second order concluded that such allegations were "of little value."  Br. 31-32 (quoting A126, 204).  As an initial matter, Tera fails to identify any inconsistency between those two conclusions.  Although the second order focuses more attention on Tera's group-

pleading allegations than the first order, that is only because the amended complaint withdrew Tera's "strongest" and "most significant" allegations, leaving it more dependent on "conclusory allegations pleaded against Defendants as a group." A206, 210.

More importantly, the district court's decision to discount Tera's group-pleading was correct. This Court's precedent recognizes that a "failure to identify the involvement of particular defendants in the alleged conspiracy" is "a basic pleading defect" that "dooms" parallel conduct allegations. *Treasuries*, 92 F.4th at 396. Numerous district court decisions that this Court cited with approval in *Treasuries* reach the same conclusion. *See, e.g.*, *In re European Gov't Bonds Antitrust Litig.*, 2020 WL 4273811, at *15 (S.D.N.Y. 2020) (plaintiff must plead facts "to tie specific defendants to the conspiracy"); *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019) ("Post-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim." (emphasis in original)); *In re Interest Rate Swaps Antitrust Litig.*, 2018 WL 2332069, at *15 (S.D.N.Y. 2018) (holding that complaint's "persistent claims as to the motivations or actions of 'the Dealer Defendants' as a general collective bloc, or generalized claims of parallel conduct, must … be set aside"); *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) ("[A]t the pleading stage in [an]

-25-

antitrust case … each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose."); *see also Treasuries*, 92 F.4th at 396-97, 407 & n.12 (citing these and other decisions).

**b. Defendant-by-Defendant analysis**. Tera criticizes the district court for declining to "go[] through each Defendant one-by-one" in its second order as it did in its first order. Br. 36. But Tera likewise declined to "go through each Defendant one-by-one" in its brief on appeal. Tera focuses instead on the antecedent question whether its allegations "as a whole" raise a plausible inference of conspiracy. Br. 39.

The district court proceeded in exactly the same way. It "consider[ed] all the allegations in the Amended Complaint," concluded that they "failed to plead a plausible section 1 claim," and granted the motion to dismiss "as to all Defendants." A209. Having found that Tera failed to plead a plausible conspiracy *at all*, the district court had no need to go through each Defendant one-by-one to determine which Defendants were adequately linked to a defective conspiracy claim.[10] In any event, Defendants demonstrate in Part II below that when each Defendant is

---

[10] To the extent Tera suggests that the district court failed to consider the remaining allegations in the amended complaint, Tera is mistaken. *Compare* Br. 35 n.25, *with* A204-09 (addressing ¶103 regarding Barclays at A206-07; ¶¶80, 121 regarding Credit Suisse at A208-09; ¶¶100-02, 121 regarding JPMorgan at A204-05, A208-09; ¶¶75, 80 regarding UBS at A206, A208; and ¶¶93, 98 regarding Citi at A204-05). The district court already had rejected as insufficient other allegations—including allegations regarding mere membership in CDS clearing organizations—in its initial motion-to-dismiss order. *See, e.g.*, A128.

considered one-by-one, the amended complaint fails to state a claim against any of them. *See infra* at 42-51.

**c. Parallel conduct**. Tera contends that the district court's second opinion "ignored" five forms of parallel conduct that the court listed in a bullet-point summary of allegations in its first opinion. Br. 36-37. Tera is incorrect: both opinions apply the same standards, and both focus on whether Tera's parallel conduct allegations are "consistent with unilateral action" or whether they allege parallel behavior "that is less easily explained as unilateral action." A134-35. The district court analyzed all of Tera's allegations and correctly concluded that, now that Tera has withdrawn the allegations that were less easily explained as unilateral action, the remaining allegations raise no inference of conspiracy. A204-09.

i. "Steering" customers away from TeraExchange. Tera asserts that the district court failed to address allegations that Defendants engaged in parallel acts of "steering" customers towards RFQ-only trading platforms. Br. 38. But the district court opinion *did* address those allegations, and it cited two reasons why they did not "support the inference of a prior agreement." A205.

First, the district court found that steering the market towards RFQ trading was fully consistent with "competitive business strategy." A205 (quoting *Twombly*, 550 U.S. at 554). Second, the court observed that the steering allegations identify conduct "by only one Defendant," *i.e.*, Citi. A204. Citi alone allegedly "steered"

transactions away from Tera by offering to "clear and settle ANZ's trades for free" if it engaged in RFQ trading. A204; A174 (¶93). Moreover, Citi allegedly made this offer more than two years before the formation of the alleged conspiracy.[11] A single Defendant's offer to clear trades at a discount well before a conspiracy allegedly began is not suggestive of a conspiracy. *See Treasuries*, 92 F.4th at 407 (rejecting parallel conduct allegation directed at only one defendant); *id.* at 403 (rejecting allegations that "long predate" the alleged conspiracy).

ii. Name give-up. Tera complains that the district court declined to credit its allegations regarding "parallel adherence to name give-up." Br. 39. But the court in fact noted that Tera failed to identify a single Defendant that purportedly "made [its] provision of liquidity conditional on the use of name give-up." A204. The court was correct: UBS is the only Defendant identified by name in Tera's name give-up allegations, and UBS allegedly *opposed* the practice. A179 (¶108). Every other allegation Tera cites consists of conclusory group-pleading. *See* Br. 39 n.27 (citing A178-83 (¶¶104-118)).

---

[11] Tera's allegation that this occurred in 2014 appears to be a typographical error. The complaint in *In re IRS* contains a version of this allegation, which also is inaccurate, but correctly places the underlying events in 2012. *See In re IRS*, No. 16-md-2704-JPO (S.D.N.Y.), Dkt. 748 ¶256. Defendants noted this error in their renewed motion to dismiss in this action, Dkt. 174 at 11 n.5, and Tera has never contested that the reference to 2014 was in error, *see* Dkt. 177; Dkt. 178 at 3 n.1.

iii. <u>The June 13, 2014 IRS trade</u>.  Tera next asserts that the district court "ignored" its allegations regarding the June 13, 2014 IRS trade executed on Tera's IRS trading platform.  Br. 39-42.  Not so.  The court provided a detailed analysis of why the withdrawal of the Audit and Threat Allegations left Tera without any meaningful parallel conduct allegations relating to that trade.  A206.  Tera identifies no errors in that analysis.

In its original complaint, Tera provided a striking—but false—account of four Defendants' parallel responses to the June 13, 2014 IRS trade.  As described in the district court's order, Tera's original complaint alleged:

> After Tera conducted its first trade on June 13, 2014, which was cleared by BNP Paribas's FCM, the FCM notified BNP Paribas's trading desk of the "transgression."  The trading desk immediately threatened the parties to the trade with loss of access to clearing services and alerted three other Defendants—Citi, JP Morgan, and UBS.  The next business day, despite the fact that the trade had never been publicized, all four Defendants separately, yet "almost simultaneously," called and told Tera that they would not clear any trades, all citing the need to conduct an "audit" of Tera's rulebook … "[N]one of these audits have ever been completed."

A133 (citing A84-85 (¶¶92-97)).[12]

---

[12] Tera did not allege in either complaint that either Barclays or Credit Suisse took any action in response to the June 13 trade.  *See* A84-86 (¶¶92-100); A167-69 (¶¶73-78).

The district court's first opinion relied heavily on these allegations, both to conclude that Tera had plausibly alleged a conspiracy and to link the four identified Defendants to the alleged conspiracy. A130-32, A135. The court relied in particular on allegations that (i) multiple Defendants "almost simultaneously" made "near-identical" demands to audit Tera's rulebook, (ii) these audit demands were "pretextual" and lacked any legitimate justification, and (iii) these demands were made the next business day after the June 13 trade, before the trade had been publicly disclosed. A133, A135.

None of those allegations appears in Tera's amended complaint. Tera now asserts that only one Defendant—BNP—contacted Tera the next business day, requesting an opportunity to conduct a know-your-customer ("KYC") review. A167-68 (¶73). Tera no longer alleges that BNP demanded a rulebook "audit," that it failed to complete its KYC review, that BNP's request was pretextual, or that it did not permit its customer to resume trading on Tera. *See id.*

Furthermore, *no other Defendant* is alleged to have done anything in response to the June 13 trade. Tera no longer alleges that Citi ever communicated with it at all, let alone that Citi ever asked to audit the Tera rulebook. *See* A168 (¶76). Similarly, Tera no longer alleges that UBS contacted it in connection with the June 13 trade, alleging instead that an internal UBS email on June 16 stated that UBS would not "cooperate" with Tera, and that UBS did not trade on Tera before or after

June 13. A168 (¶75). And Tera now admits that JPMorgan actually *facilitated* the June 13 trade by clearing the trade for Mitsubishi. A168 (¶74). Tera has withdrawn its former allegation that JPMorgan demanded to audit Tera's rulebook the next business day, vaguely alleging instead that at some unidentified time, JPMorgan "cit[ed]" a "KYC review and/or an audit." *Id.* Notably, Tera does not allege that the asserted "KYC review and/or an audit" was pretextual, that it was never resolved, or that JPMorgan's clearing customer Mitsubishi was ever denied permission to continue trading on Tera. *Id.*

Moreover, it is wholly unremarkable that a bank would seek to review a trading platform's rulebook when considering whether to trade on the platform. Tera's rulebook—like all platform rulebooks—contained numerous terms and conditions that any prudent firm would wish to review before agreeing to be bound by them.[13] Tera accordingly *withdrew* its false allegation that Defendants had no need to review its rulebook merely because the CFTC had done so. *See* SA239,

---

[13] Tera's rulebook—a judicially noticeable document filed with the CFTC—was repeatedly revised and contained provisions addressing critical topics including dispute resolution (Rules 310, 603, and 905), limits on Tera's liability (Rule 906), and the binding nature of the rules (Preamble). *See, e.g.*, TeraExchange LLC Rulebook (Feb. 2022), https://www.cftc.gov/sites/default/files/filings/documents/2022/orgsefteraexcexhibitm220224.pdf; SA140-231 (Tera submission to the CFTC reflecting revisions to its rulebook as of April 15, 2014); *see also Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) ("on a Rule 12(b)(6) motion to dismiss a court may consider matters of which judicial notice may be taken … including the fact that press coverage … or regulatory filings contained certain information" (citation and internal quotation marks omitted)).

SA267-68. Although Tera inappropriately refers to that withdrawn allegation in its Brief, Br. 40-41, it offers no reason why sophisticated financial institutions should be indifferent to the legal rules that would govern clearing and trading on Tera's platform. *See Treasuries*, 92 F.4th at 413-14 & n.15 (rejecting allegations that behavior was a "pretext" where such allegations were "implausibl[e]" or lacked "factual enhancement").

In short, Tera's amended complaint fails to "allege[] anything outside of ordinary business dealings" in response to the June 13 trade. A129. The remaining allegations at most assert that certain Defendants generally resisted Tera's business model. But Tera raises no inference of conspiracy by alleging that Defendants simply "pursued their own respective business interests, preferred to maintain a reliable and profitable market structure, and were averse to major market changes or reforms that might disadvantage them." *Treasuries*, 92 F.4th at 403.

iv. Common excuses and vocabulary. Tera also asserts that the district court "neglected" its allegations of common excuses and common vocabulary, citing an ambiguous allegation about a possible "audit" of Tera's rulebook and an allegation that UBS repeatedly reviewed and revised TeraExchange's "core documents," but never executed them. *See* Br. 42-43 (citing A167-69 (¶¶73-74, 80)). But on close inspection, the amended complaint evinces no common vocabulary at all, and pleads common "excuses" only at the most vague and amorphous level.

-32-

Following the withdrawal of the Audit Allegation, Tera now alleges that only *one* Defendant *may* have referred to an "audit." A168 (¶74). By definition, allegations of conduct by "only a single" Defendant do not qualify as parallel conduct allegations. *Treasuries*, 92 F.4th at 407. Similarly, only UBS is alleged to have reviewed Tera's core documents without eventually executing them. A169 (¶80). Tera vaguely asserts that it had a "similar experience" with Credit Suisse, *id.*, but that assertion contains no allegations of common excuses or common vocabulary.

v. Allegations of "similar pressure." Tera finally claims that the district court "neglected" its allegation that "Defendants exerted similar pressure on customers and interdealer SEFs," Br. 43-44, citing its allegations that an interdealer broker "received heated phone calls from executives at [Credit Suisse] and [JPMorgan] over the introduction of trade anonymity," A183-84 (¶121). But the district court did consider these allegations and correctly rejected them, A208-09, just as this Court rejected materially identical allegations in *Treasuries*. There, the plaintiffs alleged that an interdealer trading platform "signaled that it intended to allow all-to-all trading," and asserted that the defendants raised "the same complaints" in response. 92 F.4th at 408. This Court concluded that "there is nothing sinister about the [defendants] taking issue with the prospect of [a trading platform] offering all-to-all trading." *Id.* at 409. Likewise here, "[i]t is decidedly not indicative of a conspiracy

that a group of similarly situated market participants would object, individually and separately, to a significant market development that could cut into their profits." *Id.*

Tera also cites its allegations that "[t]he Dealers threaten any buy-side customer with being put in the 'penalty box' if it attempts to trade on an anonymous all-to-all SEF." A184 (¶123). But these allegations "refer only to the 'Dealers,' a term Tera has defined to include defendants that have been dismissed from this action." A204. The district court appropriately rejected these group-pleading allegations because they "deprive defendants of 'fair notice of what the claim is and the grounds on which it rests.'" A204 (citing *In re IRS*, 261 F. Supp. 3d at 478); *accord Treasuries*, 92 F.4th at 369 ("failure to identify the involvement of particular defendants in the alleged conspiracy" is "a basic pleading defect" that "dooms" such allegations).

\*     \*     \*

Tera ultimately argues that the district court's first order analyzed Tera's allegations "holistically," while the court's second order "dismembered" them. Br. 37. Again, not so. The district court proceeded the same way this Court proceeded in *Treasuries*: it "evaluate[d] each set of allegations separately … as part of [its] assessment of the alleged conspiracy as a whole." *Treasuries*, 92 F.4th at 403. After "considering *all* the allegations in the Amended Complaint," the district court correctly concluded that they "fail[] to plead a plausible section 1 claim." A209.

### B.  The district court correctly concluded that Tera's plus factor allegations raise no inference of conspiracy.

Because Tera fails to allege any meaningful parallel conduct, it "cannot demonstrate an agreement to conspire based on indirect evidence irrespective of [its] plus factors." *See Treasuries*, 92 F.4th at 401; *see also id.* at 415 n.17.  But in any event, the district court correctly concluded that Tera's plus factor allegations fail to reinforce its conspiracy claim.  A205-08.  "[E]ven if a plaintiff alleges additional facts or circumstances—what we have previously called 'plus factors'—these facts must still lead to an inference of conspiracy" for the complaint to survive a motion to dismiss.  A205 (quoting *Citigroup*, 709 F.3d at 137).  Tera's amended complaint does not meet that standard.

**1. <u>Common motive to conspire</u>**.  To plead a "common motive" to conspire, Tera must allege that the Defendants had a motive to agree *collectively* to engage in conduct they were unlikely to engage in *unilaterally*.  *See Twombly*, 550 U.S. at 566 (declining to infer a conspiracy from "routine market conduct" that was "only natural anyway").  No such conduct is alleged here.  According to Tera, its all-to-all trading platform threatened Defendants' trading profits.  *See* A146-49, A169-70.  As the district court recognized, "[i]t therefore was consistent with competitive business strategy for each of the Defendants to *unilaterally* avoid dealing with TeraExchange."  A205.  This Court reached the same conclusion in *Treasuries*, observing that "[i]t is decidedly not indicative of a conspiracy that a group of

similarly situated market participants would object, individually and separately, to a significant market development that could cut into their profits." 92 F.4th at 409.

Tera's "common motive" allegations are further undermined by the absence of *any* allegations that Defendants boycotted any of the four all-to-all CDS platforms that actually launched, including the anonymous all-to-all platforms operated by Bloomberg and MarketAxess. *See supra* at 7 & n.6. Tera "do[es] not … explain how this selective opposition coheres with [its] conspiratorial theory." *Treasuries*, 92 F.4th at 412. Tera's suggestion that the Defendants conspired to boycott only an inchoate all-to-all platform that never launched, without boycotting any of the platforms that *did* launch, makes no economic sense. *See, e.g.*, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 287 (1968) (where a plaintiff is "unable to point to any benefits to be obtained by [defendants] from refusing to deal with him … the inference of conspiracy sought to be drawn from [defendants'] 'parallel refusal to deal' does not logically follow."); *MacNealy v. Dayton Osteopathic Hosp. Inc.*, 1993 WL 1377513, at *9 (S.D. Ohio 1993) ("It simply is not reasonable to infer that the Defendants engaged in a group boycott of the Plaintiff … to drive one competitor … from the marketplace when, after doing so, they allowed other competitors into that market."). Tera's common motive allegations are further undermined by the fact that it now accuses only six dealers—not twelve—of participating in the alleged boycott conspiracy. A145-46, 152-58 (¶¶1, 3, 27-42 &

nn.1, 3).  Tera nowhere alleges that just six (or fewer) dealers would possess the type of "dominant position in the relevant market" required to mount a successful boycott.  *Nw. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.*, 472 U.S. 284, 294 (1985).

Tera falls back on the argument that the district court impermissibly "cho[se] among plausible alternatives" at the pleading stage when it held Tera had not adequately pled a common motive to conspire.  Br. 47 (citing *Anderson News*, 680 F.3d at 189-90).  This argument misunderstands Tera's pleading burden:  under *Twombly*, no plausible inference of conspiracy arises *in the first place* if the alleged conduct is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  550 U.S. at 554.  Tera must therefore plead something more than allegations that "suggest competition at least as plausibly as [they] suggest anticompetitive conspiracy."  *Elevator Litig.*, 502 F.3d at 51.  It failed to do so.

**2.  Conduct contrary to individual self-interest**.  Tera asserts that Defendants "acted against their own self-interest when they refused to clear trades on TeraExchange because they declined a steady stream of substantial fees."  Br. 47.  But Tera lacks any well-pled allegations that Defendants actually "refused to clear trades on TeraExchange" or that there was actually "a steady stream of substantial fees" available to be earned on the platform.  As Tera acknowledges, it never actually

-37-

launched a CDS platform, A169-70 (¶81), never had any trading volume in either CDS or IRS, A186 (¶127), and had almost no potential customers, A147-48 (¶9) (identifying only two buy-side CDS firms that allegedly "signed up to use TeraExchange"). Under those circumstances, a strategy of "sitting tight" and waiting to see if Tera ever achieved any substantial trading volume was entirely rational. *See Twombly*, 550 U.S. at 568 ("sitting tight" was "natural"); *IRS I*, 261 F. Supp. 3d at 475 n.23 (dealers did not take "any material risk by sitting tight and waiting to see if the new platforms attracted sufficient support to survive").

Sitting tight was all the more rational because "Plaintiffs do not claim that foregone [clearing] fees approached, let alone exceeded, the profit margins [allegedly] preserved by squelching the new platform[]." *IRS I*, 261 F. Supp. 3d at 477. The district court thus concluded that Tera's narrow focus on clearing fees to the exclusion of trading profits is "myopic," A208, and that each Defendant "had obvious economic reasons to encourage their customers to use" other trading platforms, A207.

**3. High level of interfirm communications**. As the district court recognized, Tera's amended complaint no longer pleads the existence of a "high level of interfirm communications" because Tera has "withdrawn its strongest allegations supporting this plus factor." A206. Without the allegations that Defendants had a "synchronized response to Tera's first swap trade," that they made "near-identical

-38-

statements" "almost simultaneously," and that Defendants referred to Tera using the "unusual mythical metaphor" of a "Trojan Horse," Tera's allegations are "largely conclusory as to this plus factor." A206-07.

Although Tera speculates that Defendants' purported "irrational interest in Tera's rulebook" suggests that interfirm communications *might* have taken place, Br. 50, the amended complaint no longer alleges that any Defendant's interest in Tera's rulebook was irrational or coordinated. *See* A167-69, A175-77 (¶¶73-74, 80, 98, 100); SA265-68 (redline showing removal of such allegations). Tera thus "fail[s] to plead the necessary evidentiary facts" to support this plus factor. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008).

Even if Tera had actually pled a high level of inter-firm communications, its own allegations provide a benign explanation for those communications. According to the amended complaint, Defendants had opportunities to communicate due to their "overlapping roles in institutions critical to the CDS market." Br. 50; A172-73 (¶¶87-88). But "[t]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred." *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).

**4. Other plus factor allegations.** Although Tera claims that it pled "as many as" three additional plus factors, Br. 45, 52, it cites no authority suggesting that the allegations it relies upon qualify as plus factors, *see* Br. 51-52. In addition, Tera

forfeited its ability to rely on these other purported plus factors by failing to raise them before the district court. *See Doe v. Trump Corp.*, 6 F.4th 400, 410 (2d Cir. 2021) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." (citation omitted)).

Tera's newly-devised "plus factors" also fail on the merits. Tera asserts that "the Dealers' control over the CDS market … gave them an unstoppable lever to paralyze prospective CDS transactions," Br. 51, but this allegation sweeps in many Dealers who are not Defendants, *see* A146 (¶3 & n.3), and in any event, allegations of market concentration must be more substantive and specific to qualify as a plus factor. *See, e.g.*, *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 318, 323 (2d Cir. 2010) (four defendants controlled over 80% of market). Tera next contends that its "meteoric and deserved rise" suggests that it must have been boycotted, Br. 51, but that contention does not survive Tera's allegations that it never "enter[ed] the market" in CDS, A169-70 (¶81), and had signed up only two potential CDS customers, A147-48 (¶9).

Finally, Tera points to the fact that several CDS dealers settled a previous class action involving the CDS market, Br. 52, but that case "did not result in any findings or admissions of liability," *IRS I*, 261 F. Supp. 3d at 477 n.25. The prior settlement thus does not constitute a plus factor. *See id.* (disregarding references to the same settlement in Tera's *IRS* complaint); *see also Iowa Pub. Emps.' Ret. Sys. v.*

*Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 323 (S.D.N.Y. 2018) (allegations of prior anticompetitive conduct by defendants "are irrelevant"); *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 661-62 (S.D.N.Y. 2016) (government investigation into possible conspiratorial conduct "is not a plus factor").

*         *         *

In sum, Tera fails to allege any viable plus factors. Moreover, even if Tera had successfully pled plus factors, those factors could not overcome the fundamental weaknesses of its allegations: Tera's allegations fail to plead any meaningful parallel conduct, *see supra* at 18-24, 27-34; they make little or no economic sense, *see supra* at 36-37; and all of the specific conduct alleged in the complaint is consistent with "rational and competitive business strategy" under *Twombly*, 550 U.S. at 554, *see supra* at 21-24, 36-37. The complaint thus fails to state a plausible conspiracy claim.

## C. The district court correctly dismissed Tera's Donnelly Act claim.

The district court correctly held that, "[b]ecause the merits of Tera's Donnelly Act claim track the merits of Tera's section 1 claim," the dismissal of that section 1 claim likewise necessitated the dismissal of Tera's Donnelly Act claim. A210. Tera similarly concedes that "[t]he pleading standard for a Donnelly Act claim is the same as for a Sherman Act claim." Br. 52. As a result, because Tera "has not stated a

-41-

plausible claim for relief under the Sherman Act, its Donnelly Act claim similarly fails." *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 101 (2d Cir. 2019).

## II.    Tera Fails To Allege Facts Connecting Any Defendant To The Alleged Conspiracy.

To state an antitrust conspiracy claim against an individual Defendant, Tera "must separately identify how [that] particular defendant contributed to the alleged conspiracy." *Treasuries*, 92 F.4th at 407 n.12. A plaintiff in a Section 1 case must therefore allege facts sufficient to establish that each of the defendants, "in their individual capacities, consciously committed themselves to a common scheme." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999). "[F]ailure to identify the involvement of particular defendants in the alleged conspiracy [is] a basic pleading defect" that "dooms" the affected allegations. *Treasuries*, 92 F.4th at 396; *see also, e.g.*, *Alaska Dep't of Revenue v. Manku*, 2021 WL 3027170, at *4 (2d Cir. 2021) (affirming dismissal of complaint that "fail[ed] to link each of the defendants individually to specific acts of anticompetitive conduct in furtherance of the conspiracy."). Accordingly, "a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails to state a claim." *Treasuries*, 92 F.4th at 397 (quoting *Mexican Gov't Bonds*, 412 F. Supp. 3d at 388).

Tera's amended complaint fails to meet this standard with respect to a single Defendant. The amended complaint "teems with conclusory allegations pleaded

against Defendants as a group but little more." A210. Moreover, the "handful of allegations that do manage to identify a specific Defendant presume a conspiracy" and are "not enough to support an inference of concerted action or a preceding agreement." *Id.* This Court may therefore affirm the district court's order dismissing Tera's claims on the alternative ground that Tera failed to plead sufficient facts to implicate any of the Defendants in the alleged conspiracy.

 **1. <u>Barclays</u>**. Tera itself appears to recognize that any alleged link between Barclays and the alleged conspiracy "snapped with the filing of the Amended Complaint." Br. 36; *see also id.* at 27 ("Tera's now-modified allegations are only dispositive for Barclays."). That is for good reason. The Trojan Horse allegation was the only allegation in the original complaint that attempted to "allege[] any connection between Barclays and the alleged conspiracy." A129. Now that the Trojan Horse allegation has been withdrawn, the amended complaint does not contain a *single* allegation purporting to connect Barclays to the alleged conspiracy. In fact, the amended complaint does not even *mention* Barclays apart from defining and identifying the Barclays Defendants (A153-54 (¶¶29-32), and listing Barclays— along with other Defendants and non-Defendants—among the members of two CDS clearinghouses (A173 (¶88 & nn.24-25)).[14] Dismissal of Barclays should be

---

[14] The district court appropriately found that Tera's allegations of membership in CDS clearinghouses—asserted against all of the major CDS dealers, Defendant and non-Defendant alike—were "clearly not a sufficient basis to establish [a

affirmed based on this "failure to specify the anticompetitive conduct of [this] particular defendant[]." *Treasuries*, 92 F.4th at 407.

**2. BNP**. Tera likewise fails to state a claim against BNP. Tera's only attempt to tie BNP to the purported conspiracy consists of the two paragraphs in which it alleges that BNP (i) cleared the only trade ever executed on Tera, and (ii) subsequently paused clearing on Tera pending completion of a KYC review and resolution of operational issues. A167-68 (¶¶72-73). But Tera no longer alleges that the KYC review was pretextual, or that BNP's operational issues were not genuine. *See* SA265-66. Rather, Tera merely alleges in conclusory terms that unidentified BNP employees "seemed surprised at the need" for investigation. A168 (¶73). And although Tera now argues that BNP could not identify particular operational issues, Br. 18-19, its amended complaint contains no allegations to that effect. Indeed, Tera *withdrew* its allegations (i) that there were "no known operational issues," and (ii) that BNP "never gave" its customer "the green light to resume trading." *See* SA266. Especially in the absence of such allegations, there is no reason to infer that performing KYC review and ironing out technical problems is anything other than unremarkable unilateral conduct.

---

Defendant]'s ties to the alleged scheme." A129. Tera does not contest this finding on appeal.

Tera responds that, despite the complete removal of the Threat Allegation, *see* SA265, the allegations that led the district court to sustain Tera's original complaint against BNP remain "intact" because "many allegations besides the 'threat' link BNP to the conspiracy," Br. 35. That is wrong. Notwithstanding Tera's rhetoric, it identifies only two paragraphs of supposedly "intact" allegations as to BNP. *Id.* at 35-36 & n.25. One of those paragraphs (¶75) does not actually mention BNP. The other (¶73) is what is left of Tera's discussion of the events following the June 13, 2014 trade after the Audit Allegation was removed. As detailed above, every element of the Audit Allegation that the district court initially found compelling was removed: Tera deleted any suggestion that BNP "alerted" Citi, UBS, and JPMorgan that the trade had taken place, *see* SA266-67,[15] eliminated any suggestion that BNP and the other three banks engaged in a "synchronized response" to the trade, *see* A206, SA265-68, and removed "the part of [the Audit Allegation] that the Court had found most compelling—namely, that Defendants had never completed those audits," A206; *see also* SA267, *supra* at 29-32. As a result, the amended complaint fails to "separately identify how [BNP] contributed to the alleged conspiracy." *Treasuries*, 92 F.4th at 407 n.12.

---

[15] Tera now acknowledges that JPMorgan facilitated the completed trade and therefore could not have learned about it from BNP. *See* SA266.

**3. Citi**.  Tera's amended complaint does not allege any viable parallel conduct by Citi.  The only allegation of *any* conduct by Citi during the alleged conspiracy period is that Citi allegedly declined to either trade or clear on Tera.  A168 (¶76).  Citi's choice not to do business on an unproven trading platform, however, is not indicative of conspiracy.  *See Treasuries*, 92 F.4th at 391, 413 (no parallel conduct suggestive of a conspiracy where defendants "could have easily concluded that trading on this unproven startup was not in their individual business interests"); *supra* at 21-24.

Tera's remaining allegations as to Citi describe only unilateral conduct that predates the purported conspiracy.  In particular, Tera alleges that Citi (i) quoted "excessively high clearing fees" to a potential Tera customer in April 2012, A174 (¶93),[16] and (ii) adopted a policy in February 2014 of not allowing Citi's interdealer brokers to execute Citi's trades on Tera, A175-76 (¶98).  These allegations occurred before the Defendants allegedly "began working together" in June 2014.  A148-49 (¶¶11, 13); A174-75 (¶94).  As a result, these allegations cannot link Citi to any post-June 2014 conspiracy.  Moreover, the district court correctly found that Tera "fail[ed] to state with whom Citi conspired" to impose elevated fees on its client in

---

[16] As noted above, the amended complaint appears to contain a typographical error, misstating that this allegation relates to conduct in early 2014.  *See supra* at 28 n.11.  And regardless, the amended complaint's claim that the alleged conversation was in April 2014, A174 (¶93), still places that conduct before the beginning of the alleged conspiracy in June of that year.

2012, and that "each Dealer had good reason to independently discourage (e.g., in its dealings with IDBs) … development of a new trading paradigm," such as the one Tera aimed to offer, A209. These conclusions are well grounded in this Court's precedents. *See Treasuries*, 92 F.4th at 407 & n.12; *supra* at 21-24.

4. **Credit Suisse**. The only allegation in the amended complaint that relates to Credit Suisse's interactions with Tera is the assertion that Tera "had a similar experience" in its separate negotiations with Credit Suisse and UBS. A169 (¶¶79-80). That allegation is woefully insufficient because Tera "fail[s] to specify how any such similarity arose, instead relying on insufficient "empty words" that lack factual content. *Treasuries*, 92 F.4th at 412; *see supra* at 32-33.

Tera's only other allegation about Credit Suisse neither relates to Tera nor is suggestive of any concerted conduct. According to that allegation, Credit Suisse made a "heated phone call" to an interdealer SEF that planned to transition to anonymous trading. A183-84 (¶121.) The district court found, consistent with this Court's precedent, that "[e]ven if Defendants feared 'that allowing nonbanks to trade anonymously could hurt their ability as swaps providers,' that fact alone does not suggest a conspiracy, since 'rational and competitive' actors would independently recognize the impact that anonymous trading could have on their bottom line." A209 (quoting A183-84 (¶121) and *Twombly*, 550 U.S. at 554); *accord Treasuries*, 92 F.4th at 409 ("It is decidedly not indicative of a conspiracy that a group of similarly

situated market participants would object, individually and separately, to a significant market development that could cut into their profits."); *supra* at 21-24.

**5. JPMorgan**.  Tera cites three allegations against JPMorgan, none of which is suggestive of a conspiracy to boycott Tera.

First, Tera alleges that JPMorgan cleared the only trade ever executed on Tera's IRS trading platform, that JPMorgan did not clear any later trades, and that at some unspecified time, JPMorgan "cit[ed] amorphous technical issues, including the KYC review and/or an audit of Tera's rulebook."  A168 (¶74).  But that allegation is most striking for what it no longer asserts.  Tera does not allege that JPMorgan contacted it in close proximity to the June 13, 2014 trade; does not allege that the "technical issues" were anything but genuine; does not allege that the issues were never resolved; and does not allege that Mitsubishi, or any other client of JPMorgan's, was *ever* denied JPMorgan's clearing services on Tera.  *See* SA265-68 (reflecting removal of such allegations).[17]  In the absence of those withdrawn assertions, this allegation simply "does not advance [Tera's] conspiracy narrative." *Treasuries*, 92 F.4th at 405.

---

[17] Indeed, Tera specifically withdrew its allegation that Mitsubishi ceased posting executable prices on Tera after the June 13 trade.  SA265.

Second, Tera alleges that JPMorgan declined to execute its own interdealer broker trades on Tera. A176-77 (¶¶100-02).[18] But JPMorgan allegedly declined Tera's offer to act as a platform for these trades in May 2014, before the alleged conspiracy began. A176-77 (¶100). Even setting that problem aside, it is "unremarkable" that JPMorgan "would independently forgo supporting" a platform like Tera that allegedly threatened its profits. *Treasuries*, 92 F.4th at 412-13; *supra* at 21-24.

Finally, Tera repeats as to JPMorgan the allegation of a "heated phone call" to an interdealer broker in response to the broker's plan to change its trading protocols. A183-84 (¶121). But "there is nothing sinister about [a dealer's] taking issue with the prospect" that a trading platform would make unfavorable changes to its protocols. *Treasuries*, 92 F.4th at 409; *see also* A208-09; *supra* at 33-34. Tera thus identifies no allegations plausibly connecting JPMorgan to a purported boycott conspiracy. *See Treasuries*, 92 F.4th at 407 & n.12.

**6. UBS**. Tera's primary allegation regarding UBS is that UBS negotiated with Tera for a time regarding whether UBS's "agency execution model" would introduce trades onto the Tera platform, but UBS did not ultimately enter into such an

---

[18] This conduct allegedly related only to JPMorgan's own trades, not to anyone else's trades. *See, e.g.*, A168 (¶74) ("JPMorgan prohibited its brokers from using TeraExchange to execute the bank's trades."); A177 (¶101) (referencing "trades which involve JPM as one of the counterparties"); A176 (¶99) (acknowledging that IDBs were free to use Tera to execute the trades of "second-tier dealers" and others).

agreement with Tera. A169 (¶¶79-80). There is nothing parallel about this activity, and nothing indicative of a boycott conspiracy.

As an initial matter, no other dealer is alleged even to have contemplated offering an "agency execution" business, and thus no parallel negotiations are alleged to have taken place. Moreover, as the district court concluded, even if one strained to infer some kind of parallelism, the fact that more than one Defendant had discussions with Tera but did not ultimately sign an agreement with it would be "an unremarkable instance of parallel conduct that is 'just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'" A208 (quoting *Starr*, 592 F.3d at 321). UBS, in the course of its discussions, "could have easily concluded that trading on this unproven startup was not in [its] individual business interest[]." *Treasuries*, 92 F.4th at 413.

Tera's brief also makes the wholly unfounded assertion that UBS "began enforcing the boycott on … June 16, 2014." Br. 40. The amended complaint contains no such allegation. Instead, Tera alleges only that on June 16, "UBS confirmed in an *internal* email that it would not cooperate with TeraExchange." A168 (¶75). That allegation merely describes unilateral conduct—and unilateral conduct no different from UBS's unilateral conduct *before* the conspiracy allegedly began on June 13, 2014, as Tera does not allege that UBS ever traded on, or cleared

-50-

for, Tera.[19]  Allegations that a Defendant declined to do business on a new entrant platform both before and after the commencement of an alleged boycott raises no inference of conspiracy.  *See Treasuries*, 92 F.4th at 412-13; *supra* at 21-24.

## CONCLUSION

The district court order should be affirmed.

---

[19] This Court may take judicial notice of the email on which Tera relies, *see Twombly*, 550 U.S. at 569 n.13 (the Court may "take notice of the full contents of the [document] referenced in the complaint"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (the Court may consider "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit" (citation and internal quotation marks omitted)), and that email further confirms that UBS was not engaged in any conspiracy to prevent all-to-all trading of swaps.  To the contrary, the email shows that UBS was actively working with—not against—anonymous all-to-all SEF platforms such as Javelin and trueEX (Tera's co-plaintiffs in the *IRS* litigation).  SA296.  The email does not refer to Tera's June 13 trade or reference any other Defendant, but merely lists Tera and another SEF as two SEFs on which UBS would not be participating.  *Id.*

May 14, 2024

Respectfully submitted,

*/s/ Roberto J. Gonzalez*

Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
bkarp@paulweiss.com

Kenneth A. Gallo
Roberto J. Gonzalez
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
2001 K Street NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
kgallo@paulweiss.com
rgonzalez@paulweiss.com

*Attorneys for Defendants Citigroup*
*Inc.; Citibank, N.A.; Citigroup Global*
*Markets Inc.; and Citigroup Global*
*Markets Limited*

*/s/ Robert D. Wick*

Robert D. Wick
John S. Playforth
Carol S. Weiland
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
rwick@cov.com
jplayforth@cov.com
cweiland@cov.com

*Attorneys for Defendants JPMorgan*
*Chase & Co.; JPMorgan Chase Bank,*
*N.A.; J.P. Morgan Securities LLC; and*
*J.P. Morgan Securities plc*

*/s/ Lawrence E. Buterman*

James E. Brandt
Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
james.brandt@lw.com
lawrence.buterman@lw.com

*Attorneys for Defendants Barclays*
*PLC; Barclays Bank PLC; and*
*Barclays Capital Inc.*

_/s/ David G. Januszewski_

David G. Januszewski
Herbert S. Washer
Jason M. Hall
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, NY 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
djanuszewski@cahill.com
hwasher@cahill.com
jhall@cahill.com

_Attorneys for Defendants Credit Suisse AG; Credit Suisse Group AG; Credit Suisse Securities (USA) LLC; and Credit Suisse International_

_/s/ Arman Oruc_

Arman Oruc
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
Telephone: (202) 346-4000
Facsimile: (646) 558-4063
aoruc@goodwinlaw.com

Christine V. Sama
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 813-8851
Facsimile: (646) 558-4063
csama@goodwinlaw.com

_Attorneys for Defendants BNP Paribas, S.A. and BNP Paribas Securities Corp._

_/s/ Peter G. Wilson_

Peter G. Wilson
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 902-1061
peter.wilson@katten.com

_Attorney for Defendant UBS Securities LLC_

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this document complies with Local Rule 32(a)(4)(A) because this document contains fewer than 14,000 words. This document contains 12,178 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). The undersigned further certifies that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.

May 14, 2024

*/s/ Robert D. Wick*
Robert D. Wick

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2024, I caused the foregoing Joint Brief of Defendants-Appellees and accompanying Supplemental Appendix to be filed electronically using the Court's ACMS system.  I further certify that all participants in the case are registered ACMS users, and that service on all parties will be accomplished electronically by the ACMS system.  I further certify that I will cause six paper copies of the Joint Brief and Supplemental Appendix to be delivered to the Court by hand delivery.


_/s/ Robert D. Wick_
Robert D. Wick