# 24-135

_____

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
_____

TERA GROUP, INC.; TERA ADVANCED TECHNOLOGIES, LLC;
and TERAEXCHANGE, LLC.

*Plaintiffs-Appellants,*

*v.*

CITIGROUP, INC.; CITIBANK N.A.; CITIGROUP GLOBAL MARKETS INC.; CITIGROUP GLOBAL MARKETS LIMITED; BARCLAYS PLC; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS, S.A.; BNP PARIBAS SECURITIES CORP.; CREDIT SUISSE AG; CREDIT SUISSE GROUP AG; CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE INTERNATIONAL; JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES LLC; J.P. MORGAN SECURITIES PLC; and UBS SECURITIES LLC.

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Southern District of New York
Case No. 17-cv-04302 (RJS)
The Honorable Richard J. Sullivan

_____

## REPLY BRIEF OF TERA GROUP APPELLANTS
_____

Jason H. Kim
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
300 S. Grand Ave., Suite 2700
Los Angeles, California 90071
Telephone: (323) 997-1057
jkim@schneiderwallace.com

*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................ii

TABLE OF AUTHORITIES ........................................................... iii

INTRODUCTION ............................................................................1

ARGUMENT ....................................................................................5

   I.   Tera States Plausible Sherman Act and Donnelly Act Claims.......5

       a.   Defendants fail to justify the district court's erroneous
           jettisoning of Tera's collective allegations. .............................5

       b.   Defendants fail to justify the district court's discarding five
           out of the eight forms of parallel conduct. ...........................10

       c.   Defendants fail to justify the district court's expelling at
           least two—and as many as five—plus factors. .....................14

       d.   Defendants fail to justify the district court's ignoring most
           of the facts linking each Defendant to the conspiracy. ........22

CONCLUSION ...............................................................................26

CERTIFICATE OF COMPLIANCE.............................................27

CERTIFICATE OF SERVICE...............................................................28

# TABLE OF AUTHORITIES

## Cases

*Anderson News, LLC v. American Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)...................................................21

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.*
  ("*Treasuries*"),
  92 F.4th 381 (2d Cir. 2024) ..............................................2, 7

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962) ..........................................................6

*Dunn v. Borta*,
  369 F.3d 421 (4th Cir. 2004) .............................................9

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007)................................................26

*In re Interest Rate Swaps Antitrust Litig.* ("*In re IRS*"),
  261 F. Supp. 3d 430 (S.D.N.Y. 2017) .........................2, 8, 12

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner &*
  *Smith Inc.*,
  340 F. Supp. 3d 285 (S.D.N.Y. 2018) ..................................8

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013)...........................................4, 21

*United States ex rel. Silingo v. Wellpoint, Inc.*,
  904 F.3d 667 (9th Cir. 2018) .......................................2, 9, 13

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) ............................................2

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015)...............................................6

iii

**Other Authorities**

Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL ST. J.
    (Feb. 16, 2015) ......................................................................24

## INTRODUCTION

Tera's original complaint alleged that twelve large banks conspired to block Tera's credit default swap trading platform from successfully entering the market.[1] After every bank moved to dismiss, the district court held that Tera plausibly stated federal and state antitrust claims against six defendants, but it dismissed the rest of Tera's claims. Tera then filed an Amended Complaint with modified allegations. Defendants again moved to dismiss, and this time the district court dismissed Tera's Amended Complaint in its entirety. *Tera Grp. II*, at A-210. This decision was in gross error.

*First*, the district court jettisoned nearly three-quarters of Tera's factual allegations about Defendants' conduct, because they were "primarily directed at Defendants as a group." *Tera Grp. II*, at A-203–04. This dismembered Tera's group boycott theory. Although Defendants suggest that the court merely "discounted" these 45 paragraphs, they are mistaken.[2] The court explicitly considered only the 17 remaining

---

[1] For the sake of brevity, Tera does not reincorporate the background material from its opening brief. *See generally* Brief of Tera Group Appellants, Dkt. No. 56 (filed Apr. 9, 2024) ("Br.").

[2] *See* Joint Brief of Defendants-Appellees, Dkt. No. 58.1 at 24–26 (filed May 14, 2024) ("Defs.' Br.").

1

paragraphs in its analysis of parallel conduct and plus factors. *Tera Grp. II*, at A-203–04. Because the court firebombed Tera's theory at square one, it is unsurprising that it could not locate a plausible conspiracy amid the rubble.

This was incorrect. In *Treasuries*, which Defendants cite over forty times, this Court explained that "*[o]f course*, a complaint alleging an antitrust conspiracy can include references to the defendants as a group, and other claims of collective conduct."[3] The district court recognized why in its first order: "Given Tera's thesis that Defendants participated in a *collective* boycott, it is natural that the complaint expresses some factual allegations *collectively*."[4]

As the Ninth Circuit recently explained, it makes no sense to discard group allegations when a group of defendants "have engaged in *precisely the same conduct*."[5] Unlike in a "chain" conspiracy—where

---

[3] *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.* ("*Treasuries*"), 92 F.4th 381, 407 n.12 (2d Cir. 2024) (emphasis added).

[4] *Tera Grp. I*, at A-126 (emphasis added) (quoting *In re Interest Rate Swaps Antitrust Litig.* ("*In re IRS*"), 261 F. Supp. 3d 430, 478 (S.D.N.Y. 2017))).

[5] *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) (quoting *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016)).

"different actors play[] different parts"—a "wheel" conspiracy like this one involves defendants engaging in "precisely the same conduct," so "there is no flaw" in using collective allegations to describe it. *Id.* Simply put, the district court's applying a dubious anti-*group* pleading rule to this *group* boycott case was contrary to basic reason. Defendants fail to acknowledge, much less justify, this ill-conceived step. *See* Defs.' Br. at 24–26.

*Second*, the district court's assessment of Defendants' parallel conduct was deeply deficient. In a one-sentence analysis, the court found only three out of eight forms of parallel conduct Tera alleged. *Tera Grp. II*, at A-204. But of the five the court omitted, two were fundamentally unchanged from one complaint to the next. And the remaining three, albeit altered, remain some of Tera's strongest allegations. *See* Br. at 38–44.

While Defendants try to paper over the district court's faulty summary by noting that it addressed some allegations later, by then it was too late. *See* Defs.' Br. at 27–34. The court had already ejected most of Tera's parallel conduct allegations and found that there was little parallelism on which to anchor an antitrust conspiracy. *Tera Grp. II*, at

3

A-204–209. So, the court's perplexing choice to examine a few parallel conduct allegations in its plus factor section was no panacea. *Id.*

*Third*, although Defendants attempt to justify the district court's near 180-degree reversal in its plus factor analysis, they cannot. The court omitted crucial details that were unchanged and made inferences in favor of Defendants that it previously made in favor of Tera. *Tera Grp. II*, at A-205–09. And rather than seriously engage with the court's disparate analyses, Defendants opt to slay strawmen. *See* Defs.' Br. at 35–41. When viewed holistically, Tera's Amended Complaint alleges eight forms of parallel conduct and at least three plus factors. And because these plus factors, "when combined with parallel behavior, might permit a jury to infer the existence of an [illegal] agreement," Tera has stated plausible antitrust claims.[6]

*Finally*, to shore up their individual positions in the event of a partial reversal, each Defendant dissects and mischaracterizes Tera's allegations to detach itself from the conspiracy. *See* Defs.' Br. at 42–51. But in accordance with the district court's (mostly) well-reasoned first

---

[6] *Tera Grp. I*, at A-137 (quoting *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 n.6 (2d Cir. 2013)).

order, Tera's modified allegations are only arguably dispositive for Barclays. *See Tera Grp. I,* at A-130–32. Tera alleges specific links for every other Defendant.

For these reasons, alongside those in Tera's opening brief, this Court should reverse the district court's decision to dismiss Tera's Amended Complaint.

## ARGUMENT

### I. Tera States Plausible Sherman Act and Donnelly Act Claims.[7]

#### a. Defendants fail to justify the district court's erroneous jettisoning of Tera's collective allegations.

Before analyzing Defendants' parallel conduct and the plus factors at play, the district court tossed out almost three-quarters of Tera's

---

[7] As an initial matter, Defendants' numerous suggestions that Tera had *separate* platforms for credit default swaps ("CDS") and interest rate swaps ("IRS")—and that Tera's "CDS platform never launched"—are false. *See* Defs.' Br. at 8, 9, 15–16, 36, 38. Indeed, Defendants argued below that Tera's claims should have been dismissed for improper "claim splitting," because "plaintiffs have no right to maintain two actions *on the same subject* in the court, against the same defendant at the same time"—which the district court properly rejected. *Tera Grp. I,* at A-123–24 (emphasis added). So, while the "first ever anonymous swap trade on any all-to-all CLOB platform" involved IRS rather than CDS, Defendants' boycott was still fatal to TeraExchange's CDS business. A-167 (¶¶ 72–73). Relatedly, Tera alleges that Defendants' boycott began *before* the first trade, *see, e.g.,* A-149 (¶ 13) (alleging an "ongoing boycott"), so Defendants' insinuations to the contrary should be ignored,

"factual matter" because it was "primarily directed at Defendants as a group." *Tera Grp. II*, at A-203–04, 210. Rather than analyzing the "whole" conspiracy, the district court "dismember[ed] it."[8] This error poisoned the rest of the district court's analysis. *Tera Grp. II*, at A-204, 210.

Although Defendants repeatedly suggest that the district court "discount[ed]" Tera's collective allegations, it did not. Def's Br. 20, 24–25. It discarded them. *Tera Grp. II*, at A-203–04, 210. Specifically, the district court identified 62 paragraphs in the Amended Complaint "that set forth factual allegations about Defendants' conduct," disposed of 45 as having "little value," and then analyzed Tera's allegations of parallel conduct and plus factors by "[t]urning to the [17] particularized allegations." *Id.*

Defendants cannot justify this move. *See* Defs.' Br. at 19–25. Opting instead for a bait-and-switch, Defendants cite a string of cases for a different proposition—that the "failure to identify the involvement of

---

*see* Defs.' Br. at 8, 28, 46, 49–50 (discussing an imaginary "post-June 2014 conspiracy").

[8] *United States v. Apple, Inc.*, 791 F.3d 290, 319 (2d Cir. 2015) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

particular defendants in the alleged conspiracy is a basic pleading defect that dooms parallel conduct allegations." *Id.* at 19–20, 25–26 (quoting *Treasuries*, 92 F.4th at 396, and citing four district court cases). But Tera agrees with this point, as it noted in its opening brief. *See* Br. at 32–36 ("Of course, Tera must give each Defendant 'fair notice' by pleading some particularized allegations 'linking' them to the conspiracy.").

Defendants cite no authority for the proposition they are truly advancing: that a court should jettison all the *group* allegations in a *group* boycott complaint. Defs' Br. at 25–26. As far as Tera is aware, this Court has never adopted such a nonsensical position. Conversely, in *Treasuries*—which Defendants cite north of forty times—this Court explained that "*[o]f course*, a complaint alleging an antitrust conspiracy can include references to the defendants as a group, and other claims of collective conduct." 92 F.4th at 407 n.12 (emphasis added). To be sure, *Treasuries* also admonished that a plaintiff "must separately identify how each particular defendant contributed to the alleged conspiracy," and Tera has done so, as will be demonstrated below. *Id.*

7

Several district courts have come to the same logical conclusion as *Treasuries*.[9] Most notably, the district court below did in its first order. *See Tera Grp. I*, at A-126 (explaining that Tera's collective allegations may "be taken into account, alongside more specific allegations, in determining whether Tera has pleaded a plausible Section 1 conspiracy." (quoting *In re IRS*, 261 F. Supp. 3d at 478)). The district court even supplied the rationale: "Given Tera's thesis that Defendants participated in a collective boycott, it is natural that the complaint expresses some factual allegations collectively." *Id.*

While this simple explanation is likely more than sufficient, the Ninth Circuit has given a more thorough one. In explaining the pleading standard for a fraud conspiracy, the court noted that, as here, "[t]here is no flaw in a pleading . . . where collective allegations are used to describe

---

[9] *See, e.g.*, *In re IRS*, 261 F. Supp. 3d at 478 ("[M]any references in the [Amended Complaint] as to the 'Dealer Defendants' are proper."); *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018) (explaining that "group pleading is insufficient to withstand review on a motion to dismiss . . . where there are *no factual allegations* in the complaint to connect each, or any, of the group defendants, directly to the conspiracy," but "[b]ecause the Amended Complaint alleges each Defendant's participation separately, it is not impermissible group pleading to refer to their collective actions in furtherance of the conspiracy using a more general phrase such as 'the Prime Broker Defendants'" (citation omitted)).

the actions of multiple defendants who are alleged to have engaged in *precisely the same conduct*." *Silingo*, 904 F.3d at 677 (citation omitted).

The court distinguished this type of "wheel" or "hub-and-spokes" conspiracy with a "chain" conspiracy, where "different actors play[] different parts," so it is "not enough to 'lump' together the dissimilar defendants and assert that 'everyone did everything.'" *Id.* But Tera does not allege a "chain conspiracy" like a bank robbery, where one defendant waves the gun, another cracks the safe, and a third drives the getaway car. *Id.* Rather, Tera alleges that Defendants engaged in "precisely the same conduct" and furthered their group boycott of Tera's CDS platform in eight, parallel ways. *Id.* So, while it *might* make sense to apply an anti-group-pleading rule in chain conspiracy cases, it defies logic in group boycott cases like this one.[10]

---

[10] *See id.*; Defs.' Br. at 19–26. However, the origins (and even existence) of any such rule are unclear. From Tera's research, it appears that district courts have occasionally gotten confused by the "group pleading presumption," which obviously has no application here. *See, e.g.*, *Dunn v. Borta*, 369 F.3d 421, 434 (4th Cir. 2004) (after the district court dismissed claims because the plaintiff relied on "impermissible group pleading," explaining that "[o]n the contrary, the group pleading presumption . . . is not a prohibition on forms of pleading; rather, it serves as a presumption that may be invoked *in favor* of a plaintiff . . . group pleading allows a plaintiff to rely on a presumption that statements in company generated documents represent the collective work of those individuals directly

In sum, the district court's rejection of Tera's group allegations was inconsistent with this Court's precedent, contrary to basic logic, and a violation to its duties to "consider the complaint as a whole" and "draw all factual inferences in favor of Tera at the motion-to-dismiss stage." *See Tera. Grp. I,* at A-127, 135. Defendants can offer no serious rebuttal. *See* Defs.' Br. at 24–26.

### b. Defendants fail to justify the district court's discarding five out of the eight forms of parallel conduct.

In glaring contrast to the first order's eight, detailed bullet points and discussion spanning four pages, the second order stated:

> Turning to the seventeen particularized allegations, the Court finds that Tera alleges parallel conduct at only the most generalized level—namely, that Defendants refused to trade (or allow [interdealer brokers] to trade) on TeraExchange or clear trades that customers executed on the platform.

*Tera Grp. II*, at A-204. This one sentence—devoid of any explanation— was the district court's entire discussion of Defendants' parallel conduct. *Id.* This summary is grossly deficient. Besides mischaracterizing the

---

involved in the company's daily management." (citations and alterations omitted)).

specificity of those three forms of parallel conduct, the district court improperly threw the other five overboard.[11]

Although Defendants suggest that the district court considered "all of Tera's [parallel conduct] allegations," it admittedly did not. Defs.' Br. at 15–16, 27. The district court found that Tera's forty-five collective allegations were "of little value" and then analyzed Defendants' parallel conduct by "turning" *only* "to the seventeen particularized allegations." *Tera Grp. II*, at A-204. Thus, it is unsurprising that the district court could no longer discern a plausible conspiracy. *Id.* at A-210. By the same token, it is difficult to discern the scene beyond one's binoculars when the lens caps are on. Defendants fail to acknowledge, much less justify, this error. *See* Defs.' Br. at 27–34.

As a result, two types of parallel conduct—Defendants' "steer[ing]" customers away from TeraExchange and toward platforms with opaque, RFQ-only trading" and Defendants' "parallel adherence to name give-up"—were discarded, even though these paragraphs remain fully intact.[12]

---

[11] *Compare id.*, *with Tera Grp. I*, at A-132–36; *see* Br. at 17–23, 38–44.

[12] *Tera Grp. I*, at A-133–34. On steering, *compare Tera Grp. II*, at A-204 (no mention), with *Tera Grp. I*, at A-123 (detailed bullet point); *compare*

The other three forms—Defendants' "parallel action towards Tera in response to its first swap trade," "common excuses and vocabulary," and "similar exertion of pressure on customers and interdealer SEFs"— were tossed as well.[13] Though Tera revised some allegations in these categories, they are still some of Tera's strongest and most specific contentions. *See* Br. at 17–23, 39–44. Indeed, according to the district court's initial, *holistic* analysis, Tera's removing the "threat" allegation and modifying the "audit" and "Trojan horse" allegations cannot have vanquished its plausible boycott theory.[14]

---

A-149, 170, 174 (¶¶ 15, 82, 93), *with* A-59, 87, 92 (OC ¶¶ 15, 105, 116) (same). On name give-up, *compare Tera Grp. II*, at A-204 (no mention), *with Tera Grp. I*, at A-134–35 (finding that these allegations "lend further support"); *compare* A-178–83 (¶¶ 104–118), with A-95–100 (OC ¶¶ 127–141) (same).

[13] *Compare Tera Grp. II*, at A-204 (no mention), *with* Tera *Grp. I*, at A-132–36 (detailed bullet points and holistic discussion). Although Tera omitted several allegations regarding Defendants' rulebook "excuses," its remaining allegations still support the inference that BNP, JP Morgan, UBS, and Citi's purported interest in Tera's rulebook was pretextual. *See* A-163–64, 167–69, 175–77 (¶¶ 59, 73–74, 80, 98, 100).

[14] *Compare id.*, *and Tera Grp. I*, at A-132–36, *with* Defs.' Br. at 10–13, 29–33, 39, 45, 48 (exaggerating the importance of these allegations and misleadingly suggesting that they were all "omitted" in Tera's Amended Complaint); *see also In re IRS*, 261 F. Supp. 3d at 476 (referencing many forms of "parallel behavior," most of which are present in Tera's Amended Complaint, "that support[] an inference of coordinated conduct to put roadblocks in the path of the new platform[].").

12

Defendants note that the district court mentioned a fraction of Tera's "steering," "name give-up," and "similar pressure" allegations in its group-pleading section, but they are wrong that these allegations should have been expelled.[15] While Defendants argue that Tera's "name give-up" and "similar pressure" allegations "failed to identify a single Defendant," they are again mistaken, because Tera's Amended Complaint defines "Dealers" as including *every* Defendant.[16] *See Silingo*, 904 F.3d at 677 ("A good claim against one defendant [does] not become inadequate simply because a co-defendant was alleged to have committed the same wrongful acts."). As for allegations that *also* provide an example via a specific Defendant, the same logic holds.[17]

And though the district court confusingly discussed a few of Tera's parallel conduct allegations in its plus factors analysis, this was too little too late.[18] Having already dismembered the alleged conspiracy, divorced

---

[15] *See* Defs.' Br. at 27–28, 34 (citing *Tera Grp. II*, at A-204).

[16] Defs.' Br. at 28, 34; *see* A-134 (¶ 3).

[17] *See* Defs.' Br. at 27, 33 (chastising Tera for giving an example for a specific Defendant).

[18] *See Tera Grp. II*, at A-206 (illogically discussing Tera's allegations regarding Defendants' "parallel responses to the first trade" and "similar excuses and vocabulary" in the context of the "high level of interfirm communications" plus factor); *id.* at A-207 (illogically discussing Tera's

the remaining allegations from their context, and found little parallel conduct to begin with, considering a few allegations in isolation and in the wrong context was no cure. *See id.* Defendants' effort to justify the district court's faulty parallel conduct analysis falls flat.

### c. Defendants fail to justify the district court's expelling at least two—and as many as five—plus factors.

The district administered the coup de grâce by reframing all of Tera's plus factor allegations and drawing inferences in favor of Defendants. *See Tera Grp. II*, at A-205–208. Yet Tera's allegations regarding Defendants' common motive—which have not changed—still lend "strong support to the inference of a prior agreement"; Tera's allegations that each Defendant's actions ran contrary to their individual self-interest—which have not changed—still "lend further" support; and Tera still makes a "substantial showing" that there was a high level of communications between Defendants. *Tera Grp. I*, at A-136–38.

---

allegations regarding Defendants' "similar pressure on customers and interdealer SEFs" in the context of the "against individual economic self-interest" plus factor); *see also* Defs.' Br. at 29–34 (insinuating that the court mentioned these allegations in the context of Defendants' parallel conduct).

**Common motive.** Defendants argue that they did not have a "motive to agree collectively to engage in conduct they were unlikely to engage in unilaterally." Defs.' Br. at 16, 35. But even the *second* order found that Defendants' common motive to conspire was "apparent on the face of the Amended Complaint." *Tera Grp. II*, at A-205; *see also Tera Grp. I*, at A-136–37 (explaining that Defendants' "common motive to conspire . . . lends strong support to the inference of a prior agreement."). Indeed, Tera "amply" pleaded that Defendants had a "common motive to conspire," because, among other reasons, "no single Defendant could prevent electronic exchanges for CDS trading from emerging, but all Defendants would profit from such prevention." *Id.*

Defendants do not even acknowledge this collective action problem. *See* Defs.' Br. at 35–37. Instead, they argue that their conduct was consistent with their self-interest. *Id.* While it was not, that is a separate plus factor. *See id.* at 37 ("Conduct contrary to self-interest."). This Court should thus ignore these arguments when analyzing Defendants' common motive.[19]

_____

[19] *See id.* Defendants also argue that Tera did not allege "that Defendants boycotted any of the four all-to-all CDS platforms that actually launched." Defs.' Br. at 36–37. But as the district court noted, "Tera

15

**Conduct contrary to individual self-interest.** Defendants' FCMs acted against their own self-interest when they refused to clear trades on TeraExchange because they declined a steady stream of substantial fees. A-168–72 (¶¶ 78, 81, 86). Indeed, the first order found that "this factor lends further, albeit only 'marginal,' support to the conspiracy claim," reasoning that "multiple actors passing up a guaranteed income stream is more suggestive of a prior agreement to drive Tera out of the market." *Tera Grp. I*, at A-138.

Yet the second order belatedly accepted Defendants' invitation to make inferences in their favor, finding that because Tera's platform posed an "obvious" "threat to Defendants' RFQ margins," it was "consistent with competitive business strategy for each of the Defendants to unilaterally avoid dealing with TeraExchange." *Tera Grp. II*, at A-205. This argument lies at the heart of Defendants' opposition. *See generally*

---

readily accounts for Defendants' decision to target its platform specifically by alleging that it was the first SEF to offer an anonymous all-to-all CLOB for CDS and that it was the only independent CLOB, in contrast to platforms like Tradeweb—a SEF created and owned by the Defendants—or Bloomberg, which did not object to the RFQ requirement. . . . Defendants' response attempts to read out of the Complaint Tera's allegations that Bloomberg deferred to Defendants in adhering to the RFQ protocol, as well as its other assertions about the uniqueness of Tera's value proposition." *Tera Grp. I*, at A-124–25.

16

Defs.' Br. (repeating that their conduct was "natural" or "consistent with competitive business strategy" over thirty times). But it fails for three reasons:

- *It forgets Defendants' collective action problem*. Since Tera's platform "could be defeated only through cooperation among multiple Defendants," it was not in each Defendant's individual interest to avoid it, because no Defendant *alone* could have blocked its rise. Rather, each Defendant could have earned *more* in clearing fees had it done business with Tera. And if most Defendants had avoided TeraExchange—while one or two had not—those "cheaters" would have earned *all* the clearing fees. Each Defendant would only have forsaken this short-term reward if they had assurances that the others would help them to achieve a sweeter one: knocking Tera out of the CDS market for good.[20]

- *It forgets Defendants' dedicating time and money toward demonstrating interest in TeraExchange*. It cannot account for why UBS and Credit Suisse were in negotiations with Tera for months. And it cannot explain why BNP's and JP Morgan's FCMs cleared trades on TeraExchange. If Tera's platform posed such an "obvious" threat to *each* Defendant's margins, then no Defendant would have engaged with Tera at all.[21]

- *It misconstrues the relevant economics*. Defendants echo the district court's conclusion that "Tera has failed to allege that the fees Defendants would have earned from clearing TeraExchange-based trades exceeded the 'large' profits they were earning from their own trading platforms and RFQ-based trading more generally." This fundamentally misunderstands the relevant economics. Defendants' fees from TeraExchange did not have to "exceed" their

---

[20] Br. at 48 (citing *Tera Grp. I*, at A-137; A-168–72 (¶¶ 78, 81, 86)).

[21] Br. at 48–49 (citing *Tera Grp. II*, at A-205; A-167–69 (¶¶ 72, 77–78, 80)).

ordinary profits; they just had to provide a marginal benefit. In other words, the fees from clearing trades on TeraExchange would have been *on top of* Defendants' ordinary profits. And Defendants' demonstrated interest in Tera's platform shows this scenario was plausible.[22]

Though these arguments cut to the core of Defendants' opposition, Defendants do not attempt to address them. *See* Defs.' Br. at 35–37. This plus factor favors a plausible conspiracy as well.

**High level of interfirm communications.** Although the district court's second order found that Tera's Amended Complaint was "largely conclusory as to this plus factor," it ignored Tera's allegations of interfirm communications that did not change from one complaint to the next. *See Tera Grp. II*, at A-207. While the first order cited Tera's now-omitted allegation that BNP alerted three other Defendants about the first trade, it also relied on Tera's allegations that "regular communications took place between Defendants' clearing divisions," that Defendants held "overlapping roles in institutions critical to the CDS market," and that

---

[22] Br. at 49 (citing *Tera Grp. II*, at A-207–08; A-168–69 (¶¶ 78, 81)).

Defendants' "common language and techniques" provided further support.[23]

Defendants' response is to point out Tera's alterations to a few of its parallel conduct allegations. *See* Defs.' Br. at 38–39 (referencing Defendants' similar "responses to the first trade," Defendants' regarding Tera's platform as a "Trojan Horse," and their "irrational interest in Tera's rulebook."). But this misses the point. While Tera's revised allegations *still* support the inference that Defendants regularly talked with one another, this inference is unnecessary because Tera alleges a high level of interfirm communications much more directly. Simply put, Defendants' tight control over the clearing business—and their overlapping rules in such institutions—"allowed their clearing operations to communicate regularly with each other."[24] The district

---

[23] *Tera Grp. I*, at A-138; s*ee* A-172–73 (¶¶ 87–90) (substantively unchanged).

[24] ¶ 90; *see, e.g.*, A-172–73 (¶¶ 87–88) (alleging that "there was no check on [Defendants'] control of the clearing business," because "the Dealers, including . . . Defendants, have owned ICE Clear, the largest clearinghouse for CDS, since its formation in December 2008"; "the Dealers also make up nearly all of the clearing members for ICE Clear, meaning that CDS customers have no choice but to attempt to clear their CDS trades through them"; "the Dealers . . . make up nearly all the clearing members for CDS at the other two major clearinghouses"; "at the CME, the Dealers constitute 11 of the 13 clearing members who clear

court correctly credited these allegations in its first order. *Tera Grp. I*, at A-138.

Defendants hedge, arguing that if Tera adequately pled this plus factor, then there was a "benign explanation for those communications." Defs.' Br. at 39. But, like all their other "benign" explanations, this ignores all the other circumstantial evidence that Tera alleged in its Amended Complaint. For instance:

- The Dealers' control over the CDS market, combined with Dodd-Frank's clearing requirement, gave them an unstoppable lever to "paralyze[] prospective CDS transactions on TeraExchange."[25]

- Tera's meteoric and deserved rise suggests that it was Defendants' boycott—not natural market forces—that caused buy-side customers and interdealer brokers to only use platforms that favored Defendants. For instance, Tera's clients' inexplicable decisions to withdraw from the platform after the first successful trade was contrary to their expressed desire and financial investment.[26]

- Defendants' history of potential antitrust violations in the swaps markets generally—and the CDS market specifically—cannot be ignored. For instance, in 2015, "the Dealers paid $1.86 billion to settle a class action brought by investors accusing them of fixing

_____

CDS"; and "at LCH.Clearnet, the Dealers make up 10 of the 12 CDS clearing members." (footnotes omitted)).

[25] *Tera Grp. I*, at A-133; *see* A-146, 170, 171–73 (¶¶ 3, 83, 87–89).

[26] *See* A-147–48, 161–67, 174–75 (¶¶ 7, 9–10, 52–71, 94–96). Buy-side traders repeatedly confirmed these allegations. A-181–83 (¶¶ 114, 117–18).

prices on CDS transactions and blocking the launch" of a different, anonymous platform for CDS trading. Although Defendants' tactics have evolved post Dodd-Frank, their goal to maintain the opaque RFQ protocol has remained the same.[27]

Whether this Court labels these pieces of circumstantial evidence "plus factors" or not is immaterial. *See* Defs.' Br. at 39–40. In the end, a plus factor is simply circumstantial evidence, "which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement."[28]

Just as in *Anderson News*, the district court erred by "disregard[ing]" certain factual allegations, erred by "characterizing" other "factual allegations as conclusory," erred by "refusing to accept as true the reasonable inferences that could be drawn from those allegations," erred by "misdirect[ing]" the plausibility requirement, and erred in its "piecemeal" reading of the complaint.[29] This Court should likewise reverse.

---

[27] *See* A-149–50 (¶ 16); *In re CDS*, 2014 U.S. Dist. LEXIS 123784, at *14–15.

[28] *Baltimore*, 709 F.3d at 136 (explaining that the three recognized plus factors "are neither exhaustive nor exclusive, but rather illustrative").

[29] *Anderson News, LLC v. American Media, Inc.*, 680 F.3d 162, 189–90 (2d Cir. 2012).

### d. Defendants fail to justify the district court's ignoring most of the facts linking each Defendant to the conspiracy.

In stark contrast to the first order—which rigorously analyzed each Defendant's link to the conspiracy (and thus dismissed five other defendants)—the second order either ignored or viewed in isolation the links that Tera alleged for the remaining Defendants.[30]

Defendants argue that the district court "had no need to go through each Defendant one-by-one" because it found that "Tera failed to plead a plausible conspiracy at all." Def's Br. at 26. Again, Defendants forget that the district court's finding followed *explicitly* from its erroneous decision to expel three-fourths of Tera's factual matter regarding Defendants' conduct. *See Tera Grp. II*, at A-203–04. Indeed, this was the only way the district court could dismiss every Defendant in one fell swoop, given the hole it dug for itself in the first order. *Compare id., with Tera Grp. I*, at A-128–132. Again, Defendants can muster no serious response.[31]

---

[30] *Compare Tera Grp. I,* at A-130–32 (scrupulously analyzing each Defendant's links to the boycott conspiracy), *with Tera Grp. II generally* (omitting any defendant-by-defendant analysis and addressing a handful of allegations in its plus factor analysis).

[31] *See* Defs.' Br. at 42–51 (failing to account for Tera's allegations that encompass every Defendant—because each Defendant engaged in precisely the same conduct).

Tera candidly acknowledges that if this Court accepts the district court's reasoning in its first order, then Tera's modified allegations may be insufficient to connect Barclays to the conspiracy. *See Tera Grp. I*, at A-129 (explaining that the "Trojan Horse" allegation is the "only . . . factual allegation [that] plausibly alleges any connection between Barclays and the alleged conspiracy"). But pursuant to the district court's thorough reasoning in its first order, the same cannot be said for any other Defendant.[32]

For the sake of ease, each Defendant is *specifically* linked to the group boycott as follows:

- **BNP.** BNP's internal clearing division cleared the first all-to-all swap trade on TeraExchange. But the very next business day, BNP told Tera that it would not clear any more trades until it completed a "know-your-customer" review, including an audit of Tera's rulebook. This was striking, given that: (1) BNP had already investigated Tera, so even its own employees "seemed surprised at

---

[32] *Compare Tera Grp. I*, at A-130 (finding that Tera's allegations regarding Credit Suisse, which are unrevised, "sufficiently link" it to the conspiracy), and *id.* at A-130–31 (finding that Tera's allegations "provide an ample basis for linking JP Morgan" to the conspiracy), and *id.* at A-131 (noting many allegations besides the "threat" link BNP to the conspiracy), and *id.* at A-131–32 (noting several allegations besides the modified "audit" allegation that link UBS to the conspiracy), and *id.* at A-132 (noting many allegations besides the modified "audit" allegation and concluding that Citi is sufficiently linked to the conspiracy "[f]or *all the reasons* discussed above") (emphasis added), *with Tera Grp. II* (omitting its previous defendant-by-defendant analysis).

the need to perform an additional investigation"; and (2) Tera's rulebook had already been audited by the CFTC *nine months earlier*, so BNP had plenty of time to review the rulebook before the first trade if it legitimately needed to. In addition to putting its own involvement on hold, Stephanie Leung, Vice President of OTC Client Clearing at BNP, told Chimera to "advise [its] trading [desk] to hold off on executing any more trades" while BNP resolved unspecified "operational issues."[33]

- **UBS.** On the same day that BNP ceased dealing with Tera, UBS "confirmed in an internal email that it would not cooperate with TeraExchange." This stood in blunt contrast to UBS's previous discussions with Tera. Previously, UBS had claimed that it wanted to use TeraExchange as an intermediary, so that its clients would not need to become SEF members themselves. After months of negotiations, UBS requested to revise Tera's core documents, including its rulebook and End User License Agreement. In April 2014, two months before the successful trade, UBS finally approved Tera's revisions and Tera provided UBS with the documents for execution, but UBS never executed the End User License Agreement.[34]

- **Credit Suisse.** Tera's experience with Credit Suisse was similar to its experience with UBS. In other words, Credit Suisse initially claimed an interest in Tera's platform and engaged in extensive negotiations, but eventually it sought to revise Tera's core documents and did not execute all of them. Additionally, an interdealer SEF run by CFI group "received heated phone calls from executives at Credit Suisse Group AG" over the introduction of trade anonymity for the buy side.[35]

---

[33] A-163, 167–68 (¶¶ 59, 72–74, 77); *see also* A-172–73 (¶ 88 nn.24–25).

[34] A-168–69 (¶¶ 75, 77, 79–80); *see also* A-172–73, 179 (¶¶ 87–88 nn.23–24, 108).

[35] A-169, 183–84 (¶¶ 80, 121) (citing Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL ST. J. (Feb. 16, 2015)); *see also* A-172–73 (¶¶ 87–88 nn.23–25).

- **JP Morgan.** JP Morgan—also a party to the first trade—followed BNP's lead in strikingly similar fashion. Like BNP, JP Morgan told Tera that it was putting its dealings on ice, because it needed to perform a "[know-your-customer] review and/or an audit of Tera's rulebook." Like BNP, JP Morgan cited amorphous "technical issues." JP Morgan also prohibited its brokers from using TeraExchange to execute trades; admitted that the new SEF rules would "cost it [alone] $1 billion to $2 billion in revenue a year"; and placed "heated phone calls" to an interdealer SEF run by CFI group over the introduction of trade anonymity for the buy side.[36]

- **Citi.** Likewise, Citi "indicated it would not be trading or clearing on TeraExchange." And like the other Defendants, Citi forced buy-side customers away from Tera's platform by quoting them exorbitant clearing fees, while offering to execute the same trades for far less (or for free) on platforms that they controlled or preferred, all of which followed the one-sided, RFQ-only policy. For instance, when ANZ Bank, one of the largest banks in the world, asked Citi to clear its trades on TeraExchange in April 2012, Chris Perkins, the head of clearing at Citi, informed ANZ that Citi would clear and settle ANZ's trades *for free* if they transacted with them directly via an RFQ protocol on Bloomberg or the Dealer Defendant-owned Tradeweb, but would charge them excessively high clearing fees to trade on TeraExchange.[37]

---

[36] A-148, 167–68 (¶¶ 12 n. 6, 72, 74, 77); *see also* A-146, 166, 172–73, 176–77 (¶¶ 3, 68, 87 n.23, 88 nn. 24–25, 90 n.26, 100–102).

[37] A-149, 168, 170, 174 (¶¶ 15, 76–77, 82, 93); *see also* A-146, 150, 166, 172–73, 175–76 (¶¶ 3, 16, 68, 87 n.23, 88 nn.24–25, 98). Defendants correctly note that the Amended Complaint contains a typographical error: the interaction between ANZ and Citi occurred in April 2012, not April 2014. *See* ¶ 116. But contrary to Defendants' repeated suggestions, Tera alleges that the boycott began *before* June 2014, so this change is immaterial. *See* Defs.' Br. at 8, 28, 46, 49–50 (discussing an imaginary "post-June 2014 conspiracy").

Defendants analogize Tera's Amended Complaint to the complaint in *Elevator*: "a list in entirely general terms without any specification of any particular activities by any particular defendant."[38] But given the "specifications" detailed above, this is another strawman. *See id.* With the possible exception of Barclays, Tera's Amended Complaint provides ample linkage for each Defendant.[39]

## CONCLUSION

For the forgoing reasons, alongside those in Tera's opening brief, this Court should reverse the district court's decision to dismiss Tera's Amended Complaint.

Respectfully Submitted,

May 28, 2024

/s/ *Jason H. Kim*
JASON H. KIM
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
*300 S. Grand Ave., Suite 2700*
*Los Angeles, California 90071*
*Telephone: (323) 997-1057*
*jkim@schneiderwallace.com*

---

[38] Defs.' Br. at 20 (citing *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007)).

[39] *See also Treasuries*, 92 F.4th at 399 ("A conspiracy . . . cannot be alleged *solely* by reference to some (much) broader group of which they are a subset." (emphasis added)).

26

## CERTIFICATE OF COMPLIANCE

I, Jason H. Kim, counsel for Appellants and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1(a)(4), that the foregoing brief is proportionately spaced in Century Schoolbook font, has a typeface of 14 points, and contains 6,013 words.

May 28, 2024                    */s/ Jason H. Kim*
                                        JASON H. KIM

## CERTIFICATE OF SERVICE

I, Jason H. Kim, counsel for Appellants and a member of the Bar of this Court, certify that, on May 28, 2024, the attached brief of Appellants was filed through the Court's electronic filing system. I certify that all participants in the case are registered users with the electronic filing system and that service will be accomplished by that system.

/s/ *Jason H. Kim*
JASON H. KIM